PEOPLE, ex rel ATTORNEY GENERAL, *v*
KOSCOT INTERPLANETARY, INC

1. Fraud—Deceptive Practices—Promotional Marketing System —Sale of Franchises.

Defendant cosmetic company's marketing plan violated the deceptive advertising statute where defendant, in its literature and sales talks selling franchises, said it intended to create a network of distributors, that the state was limited to a number equal to one distributor per 7,000 population, and that participants in the program could earn over $200,000 a year, and where the evidence showed that although the total number of distributorships might be limited in a state the distributorships could be concentrated in certain areas, thus making financial success beyond any modest degree virtually impossible, the company, in order to make sure that each franchisee accounted for the minimum recommended sales if it sold all of its franchises in Michigan, would have to have a market penetration of 20%, the company presently had a penetration of 0.24% and the largest cosmetic company, well-established, had a market penetration of 13.8%, that for the franchisees to make $200,000 a year, $300,000,000 of defendant's goods had to be sold in this state, and that the total annual projected market for all cosmetics in this state is $280,000,000 (MCLA 445.801).

2. Lotteries—Definition.

The term "lottery" means a scheme by which a result is reached by some action or means taken, in which result man's choice or will has no part, nor can human reason, foresight, sagacity, or design enable him to know or determine such result until it has been accomplished (MCLA 750.372).

---

References for Points in Headnotes

[1] 37 Am Jur 2d, Fraud and Deceit § 56.
[2–4] 38 Am Jur 2d, Lotteries § 5 *et seq.*
[5] 5 Am Jur 2d, Appeal and Error § 655.

3. LOTTERIES—ELEMENTS.

> The essential elements of a lottery are consideration, prize, and chance (MCLA 750.372).

4. LOTTERIES—PROMOTIONAL MARKETING SCHEME—SALE OF FRANCHISES—OPEN-ENDED REFERRAL SYSTEM.

> The promotional marketing scheme used by the defendant cosmetic company to sell its product in this state constituted a lottery where, as shown by the facts, the company's scheme was to sell franchises, not the company's products, the element of consideration was present in that a participant had to pay the defendant a sum of money for the privilege of joining the marketing plan, the element of prize was present in that the participant hopes to receive a return higher than his investment, and the element of chance was present in that a participant who has bought a franchise is paid for recruiting other participants, and if the recruited participant recruits someone else, the original franchisee is paid again even though the new participant is outside of the original franchisee's control and knowledge.

5. APPEAL AND ERROR—PUBLIC POLICY—CONSIDERATION SUA SPONTE.

> The Court of Appeals may raise *sua sponte* the issue of public policy (GCR 1963, 820.1[7]).

Appeal from Ingham, Sam Street Hughes, J. Submitted Division 2 October 11, 1971, at Lansing. (Docket No. 10707.) Decided January 14, 1972. Leave to appeal denied, 387 Mich 765.

Complaint by the people, on the relation of the Attorney General, Frank J. Kelley, against Koscot Interplanetary, Inc., and its directors and agents, to restrain Koscot from further sale of its product distribution system in this state. Judgment for defendant. The people appeal. Reversed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Edwin M. Bladen, Booker T. Gaulden,* and *George J. Platsis,* Assistants Attorney General, for plaintiff.

*Stewart, Lascoe & Donovan, P. C.,* for defendants.

Before: McGREGOR, P. J., and HOLBROOK and VAN VALKENBURG,* JJ.

HOLBROOK, J.  In June of 1969 the Attorney General for the State of Michigan filed a complaint against Koscot Interplanetary Inc., a foreign corporation, and its directors and agents, Elwood Eugene Rumley, Charles C. Cooper, Larry Hofmeister, and Allen Oakes, hereinafter referred to as Koscot, which sought a restraining order to keep Koscot from further sale of its distribution system for marketing cosmetic products.

Koscot is domiciled in Florida and is now licensed to do business in Michigan.  Its primary business is the manufacture of cosmetic products.  It maintains a national network for distribution of its products.

The primary distinguishing factor for its line of cosmetics is that they contain mink oil which is represented to be the oil that most closely resembles the natural oils of the human skin.

On June 3, 1969, the Circuit Court for the County of Ingham ordered defendant Koscot to show cause why a preliminary injunction should not be issued.  On June 13, 1969, a show-cause hearing was held and subsequently a consent judgment was mutually entered on June 30, 1969.

This consent judgment was amended by stipulation on November 7, 1969.  On February 12, 1970, defendant moved for vacation of the consent judgment.  The Attorney General answered and opposed said motion and requested the court to determine the legality of Koscot's marketing plan.

On August 10, 1970, an extensive hearing was conducted and on October 27, 1970, the court rendered an opinion as follows:

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

"This matter is before the court on a motion by defendant entitled as follows: 'Hearing to Determine Legality of Defendants Marketing Plan, Pursuant to Consent Judgment entered on June 30, 1969.'

"The court holds that the marketing plan is in substantial compliance with Michigan law.

"Anything in the consent judgment which conflicts with the above holding is hereby struck and held for naught.

"The motion of the plaintiff to dismiss the motion of defendant is hereby, denied. The court is of the opinion that the defendant did not, in any material manner, violate the consent judgment.

"The court is of the opinion that the marketing plan of the defendant is not a lottery; is not in violation of the Uniform Security Act; is not a fraud nor misleading and deceptive advertising in the scheme the defendant uses in recruiting representatives in Michigan.

"It is not a fraud to have one distributor to each 7,000 people, (old plan 4,000). An expert witness, called by the plaintiff, testified that Avon has 20,000 sales people in Michigan. Considering the population of Michigan as being 9,000,000 people, each Avon sales representative has 450 prospective customers.

"All of the exhibits offered by both sides, except those specifically excluded heretofore, are hereby admitted.

"The special record, appearing on page 282 to page 292 of the transcript, is hereby admitted into the main or general record, and made a part thereof.

"Orders and/or judgments may enter agreeable to this opinion."

From this opinion and subsequent judgment the people have appealed.

The issue concerning whether Koscot's marketing plan violates the Uniform Security Act has been stricken on appeal by order of this Court.

It is apparent that the selling method employed by Koscot is a dual level marketing plan. For a better understanding of how the plan works, relevant information extracted from the company's policy statement is quoted below.

"II. CORPORATE OBJECTIVES: In order to market the cosmetics and other products which it handles, Koscot intends to create a network of 40,000 distributors throughout the United States, each of whom will be a franchised independent contractor. (The *per capita* limit for any given community is one distributor per 4000 population.) Working under the distributors will be 400,000 retail sales personnel, who contract with the distributors to sell products on commission. Through the use of this network, the corporation will be enabled to market each of the many lines it handles. At present there are some 14,000 distributors in the country. The company expects to reach 40,000 in the spring of 1970, whereafter no more franchises will be sold except on a replacement basis.

"III. FRANCHISE SALE METHODS: In order to acquire its desired distributor network as rapidly as possible, the corporation pays very substantial commissions to those who bring in new distributors. Financial records will show that the company realizes very little profit from the sale of distributorship-franchises, and that its retail reorder sales are the real source of income. Distributorships are now being sold in two basic ways, one being single-level and the other being *temporarily* dual-level. These two plans are described as follows, and are offered to the public at meetings attended by distributors who bring friends and acquaintances.

"A. THE SINGLE LEVEL PLAN: D, who is a distributor, sponsors P, a prospect, by interviewing him, filling out and signing with P an application blank, and sending the application together with P's check for $4,500.00 to Koscot in Florida. This transaction constitutes an offer which only Koscot's own personnel have the power to accept. If the application is accepted, D is paid a commission of $3,000.00. P receives $2,500.00 worth of cosmetic product at retail, and has the right to reorder product at 35% of retail for all future orders. P receives training which is mandatory, and supervision from D who will assist him in organizing his business, and in selecting and hiring his retail salesgirls. These salesgirls pay P $10.00 each, and are given by him $36.00 worth of retail product. Thereafter they buy from P at 60% of retail value, and sell door to door to the public. The commission is in part a finders' fee, and in part compensation to D for the time and effort he must expend in helping P to get his operation off the ground. Of the $4,500.00 which P paid, Koscot has retained $1,500.00 It has shipped to P product whose value to the company (the standard wholesale price at 35% of retail) is $875.00. The cost of training P, who may go through the sales and business training schools as many times as he likes at no cost to him, is approximately $300.00. The cost of extensive travel by company employees to appear at sales meetings and assist in state organizations must also come from the $1,500.00 received. Therefore, for the franchise itself, Koscot receives less than $500.00. We think that legally and economically, the rights purchased by P have a value which far exceeds this amount. Our reason for paying such large commissions is of course to stimulate the rapid accretion of the distributors we feel we need. P, by virtue of having become a distributor, has the right to sponsor other prospects *so long as distributorships are available,* after which he retains only the right to buy products from Kos-

cot at the standard discount. No commissions other than the one described above are paid under this plan.

"B.   THE DUAL LEVEL PLAN: In the structure of this plan, in addition to D the distributor there is a subdistributor called S, the supervisor. S purchases his product through D at 45% of retail value; D therefore realizes a 10% (of retail) gain on all of S's sales. To earn this money, D must do actual supervision of S and assist him materially. A monthly report of this supervision must be sent by D to the company as to each supervisor under him. S organizes his retail sales girls, and sells to them at 60% of retail, just as D does. The Supervisor franchise is sold for $2,000.00, which is sent to the company for acceptance. It *must* be sponsored by a Distributor, and may be sponsored by a Supervisor as well. If the applicant, P, is accepted, a commission of $500.00 is paid to the person who brought him in, whether he be D or S. In addition, and regardless of whether the commission is paid to D or to S, D receives from the company $200.00. This is because the company will ship direct to P, as his initial order, $2,000.00 (at *retail*) worth of cosmetic products, and on such a shipment D is entitled to his standard 10%. P receives the same training precisely as under the single-level plan, and may go through retraining as often as he likes. P must be personally interviewed by D prior to submitting his application, and also by S if S is to receive any commission from the company. Of the $2,000.00 received, the company has paid out $700.00, shipped product worth to it (at 35%) $700.00, and spent $300.00 on training, leaving a gross receipt of $300.00.

"S, in addition to having the right to earn commissions and purchase product at 45%, also has the right to apply for the D position. In order to do so, he must be sponsored by a D. His application is then sent, with a check for $3,000.00, to the company.

If his promotion is approved, he is shipped $3,000.00 worth of product (at retail), which is worth to the company $1,050.00. A commission of $1,950.00 is paid to D in this transaction. It should be noted, however, that if he wished to become a Distributor for $3,000.00, he must first replace himself with another Supervisor. If he does not do so, he must pay an additional $1,000.00, which is retained by the company. This additional cost is imposed because in failing to recruit an additional Supervisor in the promotional transaction of S, the company has lost that which it seeks—an additional representative-franchisee. As is evident, if P (the prospect) wished to go directly to the D position without first becoming a Supervisor, he could do so, on the sponsorship of a D, by paying $6,000.00 to the company. He would receive $5,000.00 in retail product, and D would receive his commission of $2,650.00."

Defendant acquires potential investors in its company by use of "Golden Opportunity Meetings". A very detailed booklet providing a selling approach and technique is used by defendant in conducting these meetings. The booklet is entitled *The Distributors Training Manual* and excerpts of what the company suggests to take place at the meeting follow:

"Invite guests to the meeting. Be eager to share your wonderful opportunity with everyone you meet. Interested people are everywhere in buses, stores, on the streets, and in their homes.

\* \* \*

"DON'T GO INTO DETAILS. Never explain the program to a guest before bringing him to an Opportunity Meeting. Do not mention cosmetics or give any particulars, as many people will prejudge the program and decide it is not for them before they see the presentation.

"USE THE CURIOSITY APPROACH. When you invite a guest to an Opportunity Meeting you arouse his curiosity. Tell him you have discovered a wonderful financial opportunity that will fit him like a glove! Or, tell him you have seen a money tree and would like for him to take a look at it." (p 24.)

"AROUSE EVERYONE'S ENTHUSIASM! Help other Distributors interest their guests and they will help you interest yours. Worked properly, this first impression that guests have of KOSCOT Distributors will cause them to want to belong to the group. An Opportunity Meeting is held to arouse enthusiasm, so begin before the meeting.

\*   \*   \*

"BRING GUESTS WHO ARE NOT WELL ACQUAINTED. When you invite friends, they tend to influence each other too much. One skeptic in your group may affect the attitudes of your other guests." (p 26.)

"GIVE ALL THE SPEAKERS A BIG APPLAUSE. It will improve their performance. Always let them know that you appreciate their efforts. Do everything necessary to maintain a high level of enthusiasm. This is the whole purpose of the Opportunity Meeting, and the Distributors in the audience play as important a role as the speakers." (p 27.)

" 'Let's continue this evening with a shocking fact! Does it surprise you that 95% of the people you know have nothing to look forward to in life?' " (p 1.)

" 'There are ordinary men and women in KOS-COT like you and me who are earning 5 and even 10,000 dollars per month! In the next few minutes I will show you exactly how people are earning this kind of money, but first let's look briefly at the positions available in our company.

" 'There are 3 representative levels in KOSCOT. The first is that of the Beauty Advisor (6) the foun-

dation of our company. The next position is that of a Supervisor (7) and the highest position is that of a Director. (8)[1]

" 'You just saw how a Beauty Advisor can retail from $300 to $1,800 a month, depending upon her efforts. When she averages only $900 a month in sales for six months, she has worked her way up to the position of Supervisor (Point to the Supervisor position) with no additional investment.

" 'You may also *begin* at this level in KOSCOT, so let's put you in the picture and start you as a Supervisor in KOSCOT (9).

" 'This is you, and your job is to create retail outlets for our product (10). These outlets should be Beauty Salons, Barber Shops, Fur Shops, Studios, or girls like Alice who want to conduct Beauty Forums.

" 'Let's assume you decide to recruit girls to be trained as Beauty Advisors. The world's largest kosmetic [*sic*] company sponsors over 200,000 girls a year. Knowing this, with a full-time effort in our program, don't you believe you can sponsor at least 2 girls a week? Do all of you think you can? (Hold up 2 fingers and nod your head at the audience as you ask them the question.)

" 'Fine! You sponsor 2 girls a week or 8 (11) during your first month. Now, because you sponsored these girls, they must buy their products from you. They can't get it anywhere else.

" 'Suppose these girls are all working part-time and produce only $300 (12) in volume during their first 30 days. Since you have 8 of them (Point to the 8 girls), 8 times $300 (13) gives you a monthly volume of $2,400. This is what they have ordered from you their first month in the business.

" 'As a Supervisor you are working at a 55% discount (14). Your Beauty Advisors are at 40%

---

[1] Numbers in parentheses indicate diagram previously drawn on blackboard by speaker.

(15). The difference is 15% (16) and 15% of $2,400 is $360 (17)! This is what you have earned from the efforts of your Beauty Advisors their first thirty days in KOSCOT!

" 'You will all agree that is not a lot of money, won't you? It is certainly not the kind of money we were talking about earlier, and it is not what brought you here tonight! But it *is* a beginning.

" 'Now, let's take a look at your second month in the business. Suppose you do no more than continue to sponsor 2 girls per week or 8 (18) for the month.

" 'Since this new group is just beginning we will assume they produce only the part-time monthly volume of $300. (Point to original $300). This group then will give you a volume of $2,400 their first month. (Point to the original $2,400).

" 'The group you sponsored last month (Point to this group) has now been thoroughly trained. We have shown them that by conducting 2 Beauty Forums per week and servicing the customers they gained their first month, they can now produce an average monthly volume of $900 (19). Eight times $900 (20) equals $7,200.

" 'This gives you a total monthly volume of $9,600 (21)!

" 'You are at a 55% discount! Your girls are all at 40% (Point to this figure) so you have a 15% commission on their volume and 15% of $9,600 is $1,440 (22)!

" 'This still isn't the kind of money we were talking about earlier but it's a good place to start, isn't it? $1,440 a month is over $17,000 a year. That is more than three times the national average, so it *has* to be a good place to start!

" 'Let's look at your third month in the business. Again sponsor only 8 girls (23) who produce the part-time volume of $300 a month (Point to the $300). This new group will produce $2,400 their first 30 days. (Point to the $2,400).

" 'The last group you sponsored (Point to this group) has learned the benefits of our incentive plan. They have learned that by increasing their efforts and continuing to service their customers they can produce a monthly volume of $900 each (Point to the $900). When this occurs, this group will give you an additional $7,200 in volume (Point to the $7,200). Your first group of girls may have increased their volume even *more,* but suppose they are still producing only $900 (24) each per month or $7,200 (25) for the group. Then your total monthly volume is $16,800 (36)!

" 'At this point you will *certainly* want to become a Director (27) and enjoy the benefits of a 65% (28) discount! This gives you a commission of 25% (29), and 25% of $16,800 is $4,200 (30)!

" 'Ladies and gentlemen, this is over $50,000 (31) a year and now *we are* talking about about a great. deal of money aren't we? Do you know what excites me about this figure? Many KOSCOT Distributors are presently earning this kind of money and more! The point you should consider is this: When we can do so much, surely you can do as well or even better when you exert the necessary effort.

" 'You continue to sponsor 8 girls (32) a month and train them to produce the necessary volume, and you will be giving yourself an $1,800 a month raise in income every month. Do this for twelve months and your income will exceed $200,000 per year!

\*    \*    \*

" 'Before we can retail our product in any area, we must have an adequate network of Distributors to supply these outlets. By corporate resolution, KOSCOT has limited the number of distributorships available in each state. But while distributorships are available, let's take a brief look at another fantastic opportunity available to the Distributor.' " (pp 5–9.)

" 'To become a Director, a Supervisor must complete three requirements.   One, he must take advantage of the retail and business training that his initial investment provided for (43); two, he must purchase an additional $3,000 in product to increase his personal inventory (44); and three, he must create a new Supervisor's order for KOSCOT products (45).

" 'This means he must go out, create a new Supervisor's initial order (46), and bring this order to you (47), the Director, before you *release* this Supervisor to become a Director (48).

" 'This is the strength of our marketing plan. This means the number of Supervisors in your organization can never decrease.

" 'When this new Supervisor entered the program, he ordered $2,000 (49) in retail product.   This Supervisor created the order, so he receives the 25% commission on product.   (Point to the $500).   But *you* are the Director, so *you* earn the 10% Director's commission of $200 (50)!

" 'As soon as this Supervisor's initial order is received by the company (draw arrow from new Supervisor to company) the company sends *you* (draw arrow from company to Director) the 65% commission on this $3,000 additional inventory.   This is $1,950 (51)!   You now have earned a total of $2,850 (52)!

" 'Create this volume once a month and at the end of the year you will have earned over $34,000 (53).' "   (pp 11–12.)

" 'Ladies and gentlemen, this is KOSCOT, and this is the opportunity we have to offer you tonight! Now, turn to the person who brought you here and do two things.   First of all, thank him, for he has given you the opportunity of insuring your place among the successful 5%.' "   (p 13.)

"BEHAVIOR AFTER THE OPPORTUNITY
MEETING

"BEGIN ENROLLING YOUR GUESTS IM-
MEDIATELY after the last speaker finishes. This
is the best time, for their enthusiasm is at its peak,
at this point." (p 27.)

"Many people have joined our program, not be-
cause of the financial opportunity alone, but because
of the fraternal spirit of our Distributors. While
some individuals cannot fully understand our mar-
keting plan when they first see it, everyone under-
stands our willingness to help one another." (p 28.)

"TEAM UP WITH OTHER DISTRIBUTORS
in your area when you contact guests. Our most
successful Distributors use the Buddy System for
recruiting. As a group you will be able to show the
proper enthusiasm." (p 29.)

\*    \*    \*

"SEVEN EMOTIONAL KEYS

"USE THE ASSUMPTIVE MOOD when talking
to your guests. Assume that they will decide to join
our organization and let your attitude reflect this
assumption. Statements such as, 'We'll go talk to
your guests tomorrow,' or 'Call your cousin in Hous-
ton and get him to a meeting,' will cause the guest to
feel that he is already a part of the program.

"ASK SUBORDINATE QUESTIONS to elicit
affirmative responses and get your guest thinking
positively. Just as inertia makes it difficult to alter
the direction of a moving object, so also it makes it
difficult to switch from a positive to a negative trend
of thinking.

"Anything will do. 'Are you enjoying your steak?
Do you like my new Cadillac? Would you like to
earn $30,000 next year working part-time?' The
more positive responses you receive, the easier it
will be for your guest to think positively concerning
KOSCOT.

"TAKE ADVANTAGE OF IMPENDING
EVENTS whenever you can. Because people dis-

like decisions they will put them off as long as possible. You must give your guests a reason to make their decisions the first night they see the opportunity. Always use impending events. 'You want to enroll now because Mr. Glenn Turner will be here tomorrow night for a special meeting, and you definitely want to have guests here then! (When appropriate)

*   *   *

"OFFER AN ADDED INDUCEMENT to urge your guests to enroll as soon as possible, something more than KOSCOT alone can offer. Your personal reputation as a successful Distributor is an excellent inducement, or your reputation for helping your Distributors succeed. Or, perhaps the fact that your guest will be the first Distributor in his area." (p 30.)

### "BASIC TECHNIQUES

"BRING OUT YOUR AGREEMENT PAD before you begin your enrollments. Let him get accustomed to seeing it before you ask him to fill it out.

"ALWAYS GIVE YOUR GUESTS A CHOICE between positions in the Company. Never ask them if they are interested or if they are going to enroll. Instead ask them which position they are interested in.

"YOU WANT TO CHANNEL YOUR GUEST'S THINKING INTO A POSITIVE DIRECTION. Do this by getting him to agree on minor issues. When you want him to agree with you, nod your head at him when you ask questions.

"CONTRACT! This is another stop sign in our language. Everyone is afraid of a contract. That is why we have none in KOSCOT. We use application forms and agreement pads.

"No one wants to sign a contract and you have just asked him to read all the small print that you

can't always explain well enough to him. It is much better to have him okay the agreement.

\* \* \*

"Whatever method you use, avoid the word 'sign'. Even when you are talking with other Distributors, don't mention 'signing up' new Distributors. Instead, talk about 'enrolling' new men. The sooner you break the 'sign' habit, the better.

\* \* \*

## "CO-OPERATION TECHNIQUES

"Many times you will find a guest who will not take your pen and fill out the agreement. So you must lead this man to make the right decision.

"When you are ready for him to enroll, simply ask him a question, the answer to which you place on the agreement.

" 'What is your correct full name?'

" 'What is your correct mailing address?'

" 'What is your date of birth?'

" 'Place of birth?'

"As long as your guest lets you fill out the agreement, he is thinking your way. When you are finished, put your signature in the correct place and get him to approve of you as his sponsor." (pp 42, 43, 44.)

## "MAKING THE FINAL ARRANGEMENTS

"Sometimes your guest will fill out the agreement and enroll, but he does not have any money or a check with him. So you must make the final arrangements the next day. The only thing to avoid here is the negative people he may see before you get to him again. If you didn't have his wife come to the meeting, she may destroy his enthusiasm. Or his friends, because he will have to tell someone about the opportunity he has seen.

"Make certain he doesn't go home empty-handed. Give him a copy of *Think and Grow Rich* by Napoleon Hill. Loan him a good motivation record to

listen to.   See that he has a manual and a copy of the 'Koszette.'   Let him take your notes home."   (p 47.)

Under defendant's marketing plan, product sales and the selling of positions are affected by the aforementioned multi-level distributorship-supervisorship pyramid-sales technique.   Individuals considering position purchases are induced to buy upon the assurance that once having joined the program and paid their money they will have the right to bring or refer other prospective merchandise-position buyers to the company and receive payment from Koscot for each referred purchaser.

Three issues are raised on appeal, two of which we consider.

## I.

Does the defendant's marketing plan violate the Michigan deceptive advertising statute?

Among plaintiff's contentions is that the information used in defendant's recruiting scheme and at their opportunity meetings is misrepresented and not totally true, and as a result many persons are persuasively induced to invest from $2,000 to $5,000 to become franchisees in the business.

Section 1 of the deceptive advertising act, MCLA 445.801; MSA 19.853(1), provides as follows:

"It shall be unlawful for any person knowingly to make, publish, disseminate, circulate or place before the public any advertisement which contains any statement or representation which is untrue, deceptive or misleading; or to advertise the availability of goods, wares or merchandise so as to misrepresent or unreasonably overstate the available supply in relation to reasonably expectable public demand, unless the advertisement discloses a limitation of quantity."

Section 3 of the act (MCLA 445.803; MSA 19.853 [3]) provides:

"In determining whether or not advertising is deceptive or misleading, there shall be taken into account, in addition to the above, the extent to which the advertising fails to reveal facts material in the light or representations made or suggested in a positive manner."

Expert testimony at the trial indicated that the promises of success to the degree represented were unrealistic. This opinion was based on the fact that defendant company is new in the cosmetic field and enjoys a market penetration of less than 1% of cosmetic market sales. Claims made at the opportunity meetings promise potential investors incomes up to $200,000 per year. Further, the prospect is told that the number of distributorships available is limited.

This information concerning limitation on the number of distributorships available is predicated upon a market analysis prepared by Checchi & Company of Washington, D. C., which specializes in market feasibility studies and surveys. The company recommended that one distributor be available for every 4,000 of population. Originally Koscot had adopted this limitation but now under its new plan it has increased the number to one distributor for every 7,000 of population.

The problem arising from information concerning the number of distributorships available is that the prospect is not told that the number available in any designated geographical area is unlimited. The prospect is simply told that the number available in the state is limited.

Consequently, the number of distributorships available in Michigan might be located and concentrated in a certain geographical area, whereby, ac-

cording to the market survey analysis, financial success beyond any modest degree would be virtually impossible.

If it were disclosed to the investor that this situation can and does arise, there would be little question but that the investors would find the claims of financial success represented, to be far out of proportion to reality.   This problem is evidenced by the fact that in the City of Owosso alone there were 13 distributors for defendant's product, and there was a population of only 16,000 people.   The result of this situation, insofar as sales to ultimate consumers are concerned prevented the distributors from enjoying anything but a minimal profit as compared to the claims of income represented by defendant. Those who did make money made it from commissions for the selling of distributorships.

The people cite language from the case of *Lefkowitz* v *ITM, Inc.*, 52 Misc 2d 39, 47, 48; 275 NYS2d 303, 315 (1966), as follows:

"Depending on the size of the sales force available to respondents, and the territory available to them, somewhere along the line, the plan had to fail as a matter of economic feasibility and mathematical certainty.   No matter the junction at which this was reached, the number of latest participants would grossly exceed the sum of the participants of all prior rounds.   It is patent that by far the greater number of participants could earn no commissions.

"This is the vice and quicksand nature of 'endless-chain' transactions.   *   *   *

"While the futility of the 'endless-chain' plan is obvious to the promoters, it is not apparent to the consumer participant."

This language well covers and supports one of our major criticisms of defendant's selling scheme. Defendant's policy statement sets out that there will

be a network of 40,000 distributors and 400,000 beauty advisors for the marketing of its product on a national basis. The figure of 40,000 represents and includes not only distributorships but supervisorships as well. Under Koscot's new plan a distributor is entitled to a 25% commission on the sale of product and a supervisor is entitled to a 15% commission. In Michigan the proposed number of distributorships and supervisorships available is approximately 1250. Defendant's witness testified that under Koscot's policy statement ten beauty advisors are available to each distributor or supervisor. In Michigan, in conformance with Koscot's own recommendation there will be 12,500 beauty advisors.

We now proceed to demonstrate the improbability of defendant's claims. We approach the demonstration under conditions most favorable to defendant. Mathematical possibility for claimed financial success of a prospect at the distributorship level follows.

Assume a distributor with the recommended ten beauty advisors. Further assume each advisor sells $300 per month, the recommended minimum by Koscot. The distributor would realize $36,000 per year in gross sales. His commission is 25% or $9,000.

In Michigan, if each distributorship and supervisorship were sold, and each had the recommended number of beauty advisors, selling the recommended minimum in product, Koscot would enjoy gross sales of $45,000,000. According to witness Grigsby, the annual projected market for consumption of cosmetic goods in Michigan is $280,000,000. In theory, the $45,000,000 in sales by Koscot would represent a market penetration of approximately 20%. Koscot presently enjoys a market penetration of 0.24%. Expert testimony at the trial indicated that the

largest cosmetic company operating in Michigan supplies 13.8% of the market and the company has been in business over 80 years. It is followed by 82 other companies, 70 of which enjoy a market penetration of less than 1%. It was the expert's opinion that it would be almost impossible for Koscot to capture such a market penetration.

At the Golden Opportunity Meetings it is represented that a distributor can achieve an income beyond $200,000 per year simply by managing a sales force of beauty advisors. To realize an income of that magnitude each distributor's sales force would have to generate $800,000 per year gross volume in product sales. At these meetings, prospective franchisees are urged to have a sales force of 96 to 120 and realize bigger profits, which is in violation of the declared ratio of 10 beauty advisors per distributor set out in defendant's policy statement.

A distributor would need 220 beauty advisors selling the recommended monthly minimum in products to realize the $200,000 income figure. For each distributor in Michigan to realize a $200,000 income, a network of 2,750,000 beauty advisors selling $300,000,000 in product would be necessary. The $300,000,000 in sales is beyond the total estimated market demand for cosmetic goods in Michigan.

At the trial testimony was given by a franchisee stating that defendant's representative promised him that Koscot would repurchase the products if he was unsuccessful in selling them. When request was made to the company, they flatly refused to repurchase the goods.

After viewing Koscot's marketing plan in its most favorable light, we are constrained to conclude that defendant's scheme is a blatant attempt to extract money from investors through the use of misrepre-

sented facts, exaggerated claims and statistics, undisclosed facts, and false advertising.

## II.

Whether the defendant's marketing plan is a lottery in violation of Michigan law?

The people contend that the promotional marketing scheme of defendant is in essence a lottery in clever disguise. Further, the people contend that this scheme is analogous to a chain letter and identical to the devices of referral selling, which are frequently condemned on the basis of a lottery. We are in accord with this contention. The Michigan statute prohibiting lotteries is found in 1931 PA 328, § 372, as amended by MCLA 750.372; MSA 28-.604, which provides as follows:

"Any person who shall set up or promote within this state any lottery or gift enterprise for money, or shall dispose of any property, real or personal, goods, chattels or merchandise or valuable thing, by the way of lottery or gift enterprise, and any person who shall aid, either by printing or writing, or shall in any way be concerned in the setting up, managing or drawing of any such lottery or gift enterprise, or who shall in any house, shop or building owned or occupied by him or under his control, knowingly permit the setting up, managing or drawing of any such lottery or gift enterprise, or the sale of any lottery ticket or share of a ticket, or any other writing, certificate, bill, goods, chattels or merchandise, token or other device purporting or intended to entitle the holder or bearer or other person to any prize or gift, or to any share of or interest in any prize or gift to be drawn in any such lottery or gift enterprise, or who shall knowingly suffer money or other property to be raffled for in such house, shop or building, or to be there won by

throwing or using dice, or by any other game or course of chance, shall for every such offense be guilty of a misdemeanor, punishable by imprisonment in the state prison not more than 2 years or by a fine of not more than 1,000 dollars."

Michigan's lottery prohibition has been considered by our Supreme Court in a number of cases. In deciding these cases, the Supreme Court has formulated certain principles which must be utilized and kept in mind whenever any application of Michigan's lottery prohibition is under consideration.

In *People* v *McPhee,* 139 Mich 687, 690, 691, 692 (1905), the Court discussed the difficulty of defining the evil that our lottery statute is intended to curtail. Further the case indicated that a broad meaning is to be given the term lottery. The Court said:

"A lottery may be defined to be any scheme whereby one, on paying money or other valuable thing to another, becomes entitled to receive from him such a return in value, or nothing, as some formula of chance may determine.

\*   \*   \*

"Our statute does not justify a court  \*   \*   \*  in deciding a thing is not a lottery simply because there can be no loss, when there may be very large contingent gains or because it lacks some element of a lottery according to some particular dictionary's definition of one, when it has all the other elements, with all the pernicious tendencies which the state is seeking to prevent."

\*   \*   \*

"The statute is intended to reach all devices which are in the nature of lotteries, in whatever form presented, and the courts will tolerate no evasions for the continuance of the mischief."

In the case of *People* v *Elliott,* 74 Mich 264 (1889), the Court held the term lottery to mean a scheme by

which a result is reached by some action or means taken, and in which result man's choice or will has no part, nor can human reason, foresight, sagacity, or design enable him to know or determine such result until the result has been accomplished.

In *Sproat-Temple Theatre Corp* v *Colonial Theatrical Enterprise, Inc,* 276 Mich 127 (1936), the Court held the essential elements of lotteries to be consideration, prize, and chance, even though not specifically defined by statute.

In the case before us, the elements of consideration and prize are clearly present. Consideration is present in that a participant in the Koscot plan must pay a sum of money for the privilege of joining the marketing plan. Prize is present in that the participant hopes to receive a return higher than his investment by bringing prospects to a Golden Opportunity meeting whereby the defendant may be able to sign one or more prospects into the organization, thereby allowing the participant to earn commissions on those over whom he exercises no control. When one invites and brings a prospect to a Golden Opportunity meeting he is relying on the ability and efforts of the operators of that meeting, representing defendant, to persuade the prospect to join. This contingency satisfies the element of chance. For example, if "A", a distributor, brings "B", a prospect, to a meeting and "B" purchases a supervisorship, and "B" in turn brings "C" to another meeting, and "C" purchases a supervisorship; "A" makes money from both "B" and "C", with "C" being outside of "A's" knowledge and control. This constitutes chance dominating over skill.

In many instances there is virtually no contact maintained after a person is sold a franchise by defendant. He can move anywhere in the country

and yet the person who recruited him will receive profits from whatever he does.

If "X" in Florida recruited "Y" in Michigan, "X" would receive a commission on any sales of recruitees brought in by "Y", regardless of where "Y" locates. There would be no contact between "X" in Florida and the new recruitees of "Y".

The case of *Twentieth Century Company* v *Quilling,* 130 Wis 318, 323–325; 110 NW 174, 176 (1907), arose from facts very similar to the case before us. Relevant language found therein is set out below:

"The written contract, while containing some of the conditions of the real arrangement made, was largely a mere cover executed to give appearance of fairness and legality to the arrangement;   *   *   * that the real arrangement was a joint scheme to make money by selling similar nominal territorial rights to others who should also become parties to the scheme and sell similar territorial rights to still others, and so on—the idea being that the process should go on in constantly broadening circles as long as purchasers could be found who were foolish enough to buy, and thus necessarily leave the ultimate purchasers with nothing to show for their money or notes save the practically worthless right to sell the patented device in some backwoods county.

"We are unable to regard such a project as a legitimate business enterprise. How large would be the number of purchasers who would be induced by the prospect of large returns for little labor to join the scheme it is impossible to say or even speculate. Each purchaser would be desirous to get back at least as much as he had invested. In order to do this, the first purchaser under the most favorable circumstances would have to sell rights aggregating $1,000, the second purchaser would have to sell rights aggregating $2,000, and thus the necessity of

finding victims would increase in geometrical progression until the purchasers who are in the tenth place from the original purchasers must, in order merely to reimburse themselves, find others who would pay more than half a million dollars. Of course, it is not likely that the scheme would last so long as this, but however long it lasts, it will infallibly leave a greater or less crowd of dupes at the end with no opportunity to recoup their losses because the bubble has at last burst. It contemplates an endless chain of purchasers, or, rather, a series of constantly multiplying endless chains, with nothing but fading rainbows as the reward of those who are unfortunate enough to become purchasers the moment before the collapse of the scheme. While contemplating large gains to the original promoters and early purchasers, it necessarily contemplates losses to the later purchasers; losses increasing in number with the greater success of the scheme.

\* \* \*

"Any contract which contemplates or necessarily involves the defrauding or victimizing of third persons as its ultimate result must be *contra bonos mores*."

Defendant in the case at hand has promulgated a scheme which has all the earmarks of a lottery. The population limitation of one distributor for each 7,000 of population is clearly a fiction since saturation of the market will inevitably occur.

The evidence shows that sales to ultimate consumers in Michigan were very small, and most of the sales by defendant in Michigan were sales of inventory to distributors and supervisors. This indicates the main thrust in defendant's scheme is not to sell product to the ultimate consumer, but rather to sell franchises through the referral plan.

The combined number of distributorships and supervisorships sold in Michigan to date is over 300.

Assuming those presently holding franchises re-cruit, on an average, one prospect who buys a new franchise, that will total approximately one-half of the franchises available in Michigan under defend-ant's plan. If these franchisees also bring in, on an average, one prospect who purchases a franchise, we have reached the saturation point for franchises in Michigan. These last 600 franchisees will be pre-cluded from participating in the referral plan. The defendant is in a position to know this, but that in-formation is not so obvious to the new recruitees.

In the recent past, open-ended referral schemes have multiplied and come before the courts in sev-eral jurisdictions. In a number of these cases, the courts have passed upon the issue of whether or not such schemes constitute lotteries. The leading case is *Sherwood & Roberts—Yakima, Inc, v Leach*, 67 Wash 2d 630, 635–636; 409 P2d 160, 163 (1965). In that case appliances were sold at inflated prices. The purchasers received the privilege of referring potential customers to the seller. The seller prom-ised to pay $100 for each sale to a prospect whose name was submitted by the buyers, and $200 for each 15 names so submitted to whom the seller's salesman made a presentation. The purchaser was to send a card to each prospect he selected indicating a friend would call upon him and show him a fabu-lous program. The program was not described until the solicitor came. The Court used the following language:

"Assuming that respondents in fact used skill or judgment in selecting the referrals, the trial court properly held that chance permeates the entire scheme. The court found that respondents *took a chance that the referrals might not be interested; that the salesman might not adequately make his*

*presentation;* that the referral might have already been referred by someone else; that the market might be saturated; and that the salesman might not even contact the referral.   In addition, the trial court noted that respondents have no control over the general operation after they gave the names of referrals.   In fact, respondents were told not to contact the referrals before the Lifetone salesman made his presentation, and respondents were told to emphasize the money-making program in case the referrals contacted them.   *   *   *

"It is inherent in referral selling that purchasers such as respondents be without control.   *Sooner or later, the market, unknowingly to the purchasers, will become saturated.*   This principle is the same as in the chain letter scheme.   The case at hand is a classic example."   (Emphasis supplied.)

In *Lippincott Mortgage Investment Co* v *Childress,* 204 So 2d 919, 920–921, 923 (Fla DCA, 1967), the Court described the following plan:

"Universal Marketing Research, hereinafter referred to as Universal, was engaged in the promotion and sale of central vacuum cleaning systems for use in private homes.   In January of 1966 one Prichett, a friend of appellees, approached them and asked if they were interested in making some money. After receiving a positive response from appellees, Prichett stated that he would send somebody out to talk to them about the proposition.   Several nights later they were visited. in their home by two representatives of Universal who explained the program sponsored by their company designed to sell their product and to earn money for the purchasers.   Under the plan appellees would agree to purchase for installation in their home a central vacuum cleaning unit for a total cost of approximately $750 cash, or $975 if bought on a time payment plan.   To evidence this indebtedness appellees would give their prom-

issory note in return for which they would be employed as representatives of Universal under a commission agreement, the earnings from which would pay for the vacuum cleaning unit and in addition yield appellees an indeterminate amount of money. Under the commission agreement appellees would furnish Universal the names of 16 of their home-owning friends considered to be prime prospects for purchasing the vacuum cleaning unit. For each unit sold by Universal to the prospects furnished by appellees, the latter would be paid the sum of $50. It was represented that sales to such prospective purchasers would yield commissions sufficient in amount to pay in full the promissory note representing the purchase price of the unit sold to appellees. In addition, each prospect submitted by appellees would be offered the same proposal offered appellees, and each would be requested to furnish Universal the names of 16 of their friends who might be good prospects for purchasing a vacuum cleaning unit. For each person referred by appellees' prospects to whom a unit was sold, appellees would be paid an additional sum of $50. It was from commissions to be earned by the sale of units to the persons referred by appellees' prospects that the big money would be made. The prospective purchasers on this second level of the plan would theoretically number 156 and represent a potential yield of $7,800 in commissions to appellees. Appellees would agree to contact their friends whose names they would submit to Universal and interest them in the idea of participating in a plan to make money, and not to discuss the plan with them in detail until after Universal's representatives had had an opportunity of making a demonstration to them of the plan in its entirety.

"As an outgrowth of the foregoing meeting between appellees and the representatives of Universal, appellees agreed to purchase a vacuum cleaning unit and signed a promissory note in the amount of

$972 payable to Universal in 36 monthly installments. This note represented the purchase price of the unit which was later installed in appellees' home, and the note was subsequently assigned to appellant. At the time of executing the foregoing promissory note, appellees also signed a commission agreement containing in substance the terms and provisions hereinabove related. In the discharge of their obligation appellees furnished to Universal the names of 16 of their friends whom they considered would be interested in purchasing the vacuum cleaning unit, and subsequently received from Universal commissions in the total sum of $200. Upon failure or refusal of appellees to make any of the monthly payments called for in their promissory note, this suit was instituted.

\* \* \*

"From a careful consideration of the foregoing statute, it is our conclusion that the plan or scheme devised by Universal and used in the promotion and sale of its vacuum cleaning units falls within the purview and intent of the statute, and constitutes a lottery. *The motivating factor which induced apellees to enter into the business arrangement with Universal was not a desire to purchase a vacuum cleaning unit, but to be paid a lot of money in return for a minimum expenditure of time or effort.* The purchase of the cleaning unit was incidental to the overriding motive on the part of appellees to earn money by way of commissions on sales to be made by Universal. Although the commission agreement made it clear that the cost of the unit purchased by appellees was to be paid regardless of the accrual of commissions, appellees were assured that the promissory note they signed should be of no concern because the commissions they could expect to be paid them would more than pay the note in full. The plan encompassed the organization by Universal of a group of prospective purchasers suggested

by appellees who were brought together under a plan whereby commissions would be paid to appellees, as well as to the prospective purchasers named by them, the membership of which group would increase through a chain process of new members securing other new members and thereby advancing themselves in the group to a position where they in turn would receive commissions. Concluding as we do that the undisputed evidence establishes as a matter of law that the transaction between appellees and Universal out of which issued the promissory note sued upon constituted a lottery within the meaning and intent of the statute quoted above, it follows that the trial court was correct in rendering summary final judgment in favor of appellees." (Emphasis supplied.)

In view of the foregoing cases, we conclude that the plan devised and used by Koscot for the sale of cosmetic products, constitutes referral selling and a lottery, which is prohibited by our statute, *supra.*

It is evident from defendant's policy statement that its scheme is to generate the income of money to the company through the sale of distributorships and supervisorships through a referral plan. These distributorships and supervisorships are general in nature and do not grant an exclusive right to sell in any designated geographical area to the purchaser.

We can see that if a distributor sells another distributorship or supervisorship he receives a rebate called a commission in the form of a percentage of the cost of the new distributorship or supervisorship. The emphasis of this plan is placed by the company on the ability of distributors and supervisors to recruit others into the plan.

While the company supplies a training program for the new franchisees, even at these meetings the major emphasis is placed upon recruiting new dis-

tributors and supervisors. Each distributor and supervisor is permitted and recommended to bring prospects to a meeting from anywhere in the state, including his own area, to be sold a franchise by the defendant.

It seems clear that if Koscot's plan was to sell the product to the ultimate consumer the distributors would not be urged to solicit prospects that will necessarily be in direct competition with themselves. Again, the emphasis is placed on recruiting new distributors and inventory loading, not on sale of product to ultimate consumers.

At the opportunity meetings the fantastic monthly incomes represented to be available in some instances, *i.e.,* $10,000, are not based upon selling the product door to door but rather selling other distributorships and supervisorships.

The people have not and do not oppose the sale of defendant's products in this state. Their contention is that the sale's plan should be carried on in such a manner that sales to the ultimate consumer should be the fundamental goal of the company rather than sales of distributorships and supervisorships, through the referral scheme.

We are in accord with this position. In viewing the case we come to the conclusion that the public policy of the State of Michigan could have been considered in the trial court, but was not raised.

Authority for raising this issue *sua sponte* is found in the provisions of GCR 1963, 820 which states:

".1 Relief Obtainable. The Court of Appeals may, at any time, in addition to its general powers, in its discretion and on such terms as it deems just:

\*    \*    \*

"(7) Give any judgment and make any order which ought to have been given or made, and make

such other and further orders and grant such relief,
as the case may require."

In *Sipes* v *McGhee,* 316 Mich 614, 623–624 (1947),
the Court gave a definitive meaning to the term pub-
lic policy:

"What is the meaning of 'public policy?' A cor-
rect definition, at once concise and comprehensive,
of the words 'public policy,' has not yet been formu-
lated by our courts. Indeed, the term is as difficult
to define with accuracy as the word 'fraud' or the
term 'public welfare.' In substance, it may be said
to be the community common sense and common
conscience, extended and applied throughout the
State to matters of public morals, public health,
public safety, public welfare, and the like. It is that
general and well-settled public opinion relating to
man's plain, palpable duty to his fellow men, having
due regard to all the circumstances of each particu-
lar relation and situation.

"Sometimes such public policy is declared by
Constitution; sometimes by statute; sometimes by
judicial decision. More often, however, it abides
only in the customs and conventions of the people,—
in their clear consciousness and conviction of what
is naturally and inherently just and right between
man and man. It regards the primary principles of
equity and justice and is sometimes expressed under
the title of social and industrial justice, as it is con-
ceived by our body politic. When a course of con-
duct is cruel or shocking to the average man's con-
ception of justice, such course of conduct must be
held to be obviously contrary to public policy,
though such policy has never been so written in the
bond, whether it be Constitution, statute or decree of
court. It has frequently been said that such public
policy is a composite of constitutional provisions,
statutes and judicial decisions, and some courts have
gone so far as to hold that it is limited to these. The
obvious fallacy of such a conclusion is quite appar-

ent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone—the foundation—of all constitutions, statutes, and judicial decisions, and its latitude and longitude, its height and its depth, greater than any or all of them."

Our Supreme Court has on many occasions set forth our duty in regard to reviewing equity cases *de novo,* and reiterated the rule in the case of *Biske* v *City of Troy,* 381 Mich 611, 613–614 (1969):

"To quote Justice T. M. Kavanagh, writer of the Court's opinion in the *Christine Case* (pp 517, 518):

" 'We hear and consider chancery cases *de novo* on the record on appeal. *Johnson* v *Johnson,* 363 Mich 354 (1961); *Osten-Sacken* v *Steiner,* 356 Mich 468 (1959); *Futernick* v *Cutler,* 356 Mich 33 (1959); *A & C Engineering Co.* v *Atherholt,* 355 Mich 677 (1959); *Straith* v *Straith,* 355 Mich 267 (1959); *Ball* v *Sweeney,* 354 Mich 616 (1958). This Court, however, is inclined to give considerable weight to the findings of the trial judge in equity cases. This is primarily because the trial judge is in a better position to test the credibility of the witnesses by observing them in court and hearing them testify than is an appellate court which has no such opportunity. We do not ordinarily disturb the findings of the trial judge in an equity case unless, after an examination of the entire record, we reach the conclusion we would have arrived at a different result had we been in the position of the trial judge.' "

After much due, needed, and difficult consideration of all the evidence in the case, we are compelled to reach the conclusion that we would have been required to arrive at a different result had we been in the position of the trial chancellor. We therefore determine that the Koscot's marketing plan is in violation of the Michigan deceptive advertising statute, constitutes a lottery under Michigan law, and is in violation of the declared public policy of our state for the reasons hereinbefore enumerated. *McNamara* v *Gargett,* 68 Mich 454 (1888), and *Skutt* v *City of Grand Rapids,* 275 Mich 258 (1936).

We order a judgment be entered in accord with our determination herein, together with an injunction restraining defendant and its agents from developing a distribution system in the State of Michigan through its marketing plan, including the referral system herein described. Further, that the defendant and its agents desist and refrain from using such deceptive advertising found herein to be violative of the Michigan deceptive advertising statute.

Reversed. Costs to plaintiff.

All concurred.