643 A.2d 535

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
HARRY DeLUZIO, DEFENDANT–RESPONDENT.

· STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. JOHN KELTY, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. LOIS SANDERS, DEFENDANT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
DONALD SANDERS, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. THEODORE WATLEY, DEFENDANT–
RESPONDENT.

Argued March 29, 1994—Decided June 27, 1994.

*Larry R. Etzweiler,* Deputy Attorney General, argued the cause
for appellant (*Deborah T. Poritz,* Attorney General of New Jersey,
attorney).

*Sonia G. Wagner,* Designated Counsel, argued the cause for
respondent Harry DeLuzio (*Susan L. Reisner,* Acting Public
Defender, attorney).

*Barbara J. Lieberman,* Designated Counsel, submitted a letter
in lieu of brief on behalf of respondent John Kelty (*Susan L.
Reisner,* Acting Public Defender, attorney).

*Anderson D. Harkov,* Designated Counsel, submitted a letter in
lieu of brief on behalf of respondent Donald Sanders (*Susan L.
Reisner,* Acting Public Defender, attorney).

*John Vincent Saykanic,* Designated Counsel, submitted a letter
in lieu of brief on behalf of respondent Theodore Watley (*Susan L.
Reisner,* Acting Public Defender, attorney).

PER CURIAM.

The Court denied the petitions for certification filed by defendants Lois and Donald Sanders and granted the State's cross-petition for certification. 134 *N.J.* 564, 636 *A.*2d 521 (1993). That portion of the judgment of the Appellate Division that is under review on the State's appeal is affirmed, substantially for the reasons expressed in the opinion of the Appellate Division, reported at 274 *N.J.Super.* 101, 643 *A.*2d 609 (1993).

O'HERN, J., dissenting.

The Court has set aside the convictions of Lois Sanders, Donald Sanders, and Theodore Watley for promoting gambling, a violation of *N.J.S.A.* 2C:37–2, and possession of gambling records, a violation of *N.J.S.A.* 2C:37–3, on the basis of the Appellate Division opinion below, 274 *N.J.Super.* 101, 643 *A.*2d 609 (1993). Specifically, the State charged defendants with promoting an illegal lottery, a third-degree offense under *N.J.S.A.* 2C:37–2. The Appellate Division held that the familiar form of a pyramid scheme is not a "lottery" within the meaning of *N.J.S.A.* 2C:37–1(h), and therefore does not constitute a gambling offense. The Court has also set aside the convictions of Officers Harry DeLuzio and John Kelty for promoting gambling, in violation of *N.J.S.A.* 2C:37–2, and official misconduct, a violation of *N.J.S.A.* 2C:30–2(b), which were dependent on the underlying offenses of the Sanderses.

The facts regarding defendants' pyramid scheme are well known. See *State v. Sanders,* 212 *N.J.Super.* 599, 601–03, 515 *A.*2d 1256 (App.Div.1986), *rev'd,* 107 *N.J.* 609, 613–14, 527 *A.*2d 442 (1987). Lois Sanders and her son Donald were the masterminds of an intricate pyramid scheme designed to defraud investors of their money. In late 1980, the Sanderses created Co–Op Investments (Co–Op) in New Jersey after profiting from a similar pursuit in California. Defendants enticed investors to enter the scheme for a fee of $650 by dangling before them a purported payout of $35,000 if they reached the top of the pyramid. Charts allowed investors to track their progress up the pyramid and

determine their chances of winning the $35,000. Over 2,000 persons invested a total of well over $1,000,000 in the Co–Op scheme. The court issued a permanent injunction on March 17, 1981, prohibiting Co–Op from operating in New Jersey. The Sanderses fled to Illinois and immediately established a third pyramid scheme. Eventually, they were returned to New Jersey to stand trial for offenses arising out of their involvement in Co–Op. The Appellate Division has affirmed the jury convictions of various related theft offenses; only the lottery-related convictions were set aside. 274 *N.J.Super.* 101, 643 *A.*2d 609 (1993).

In its petition for certification, the State asserted: "Defendants in this case duped the public into believing that their lottery was an investment scheme. Unfortunately, defendants also duped the Appellate Division, which is unable to recognize the breadth of our proscription against lotteries." Regrettably, Lois and Donald Sanders have succeeded as well in convincing this Court that their pyramid-swindle scheme was just another business venture, albeit accompanied by the futile hope of financial gain by investors and a one-way cash flow into the pockets of "con artists." By raising a facade of legitimacy and by relentlessly pursuing their fraudulent activity, defendants have "artfully dodged" the proscription against illegal lotteries.

Undoubtedly, the Legislature will soon remedy the interpretive problem. In the meantime, I do not believe that these defendants should benefit from the misperception that their enterprise was anything but a Ponzi-type criminal lottery. (Charles Ponzi was a notorious swindler who, starting in 1919, defrauded investors of $9,582,000 in eight months by promising to repay them $150 in ninety days for every $100 invested. *Cunningham v. Brown,* 265 *U.S.* 1, 44 *S.Ct.* 424, 68 *L.Ed.* 873 (1924).) As in a Ponzi swindle, defendants were simply "using newly invested money to make old investors think they were earning profits rather than losing their shirts." *Bosco v. Serhant,* 836 *F.*2d 271, 274 (7th Cir.1987), *cert. denied,* 486 *U.S.* 1056, 108 *S.Ct.* 2824, 100 *L.Ed.*2d 925 (1988).

Other jurisdictions that have analyzed pyramid-swindle schemes have had very little difficulty perceiving their nature as lotteries. Essential to pyramid schemes is the process of current members recruiting new members, which, at least in theory, advances the rank of the older members in the scheme, thus qualifying them to receive more money back than they originally invested. Such schemes meet the three classic requirements of a lottery: (1) consideration (the money paid for the position on the pyramid); (2) a prize (the money received when the participant reaches the top of the pyramid); and (3) chance ("the uncertainty over whether the participants can find new participants, or, to put it bluntly, people even more foolish than they were in sufficient numbers," *Solon v. Meuer,* 141 *Misc.*2d 993, 539 *N.Y.S.*2d 241, 243 (Civ.Ct. 1987), so that they may reach the top of the pyramid). In a whole variety of other settings, courts have found those essential elements in pyramid swindles. See, *e.g., People ex rel. Kelley v. Koscot Interplanetary, Inc.,* 37 *Mich.App.* 447, 195 *N.W.*2d 43, 55 (Mich.Ct.App.1972) (stating that pyramid marketing plan, main purpose of which was not to sell products to consumers but rather to distributors, had "all the earmarks of a lottery"); *Wesware, Inc. v. State,* 488 *S.W.*2d 844 (Tex.Civ.App.1972) (holding that pyramid-selling scheme under which participants gambled on returns was illegal lottery).

*Solon, supra,* 539 *N.Y.S.*2d 241, involved an attempt to disguise a pyramid swindle as an "airplane game." A "passenger" paid $1,500 to the "pilot" for one of eight seats on an "airplane." When all eight seats were "occupied," the airplane would split into two new airplanes, with passengers graduating to "crew members," former crew members becoming "co-pilots," and former co-pilots becoming pilots. The original pilot at the top of the pyramid would take $12,000 and "pilot out." The whole process repeated when new pilots began selling the open seats on their airplanes. That scheme, indisputably illegal, was extremely popular and well managed. Just like the swindlers in Co–Op, the organizers of the "airplane game" duped countless people with a smoke screen comprised of showy banquet-hall meetings and deceptive business

jargon—*e.g.,* "seminar," "workshop." "Piloting out" eventually became difficult, if not impossible, as the players' "avarice likewise blinded them to the mounting requirements of geometric progression which had to be satisfied * * *." *Id.* at 242. The court concluded that "[t]here is no reason to let defendant keep what she won in so inherently unfair a game." *Id.* at 243.

Without a doubt, the scheme in this case meets the first two basic requirements of the legal definition of a lottery: consideration and a prize. The majority, however, does not find the element of chance or the representation of that chance by a number or other medium. The New Jersey statute defines a "lottery" as

an unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value.

[*N.J.S.A.* 2C:37–1(h).]

Although Co–Op did not involve a drawing, did it involve another "method based upon the element of chance" represented by a numerical combination? In *Wesware, supra,* 488 *S.W.*2d 844, Chief Justice Phillips explained that the chance element arises in a pyramid scheme because the participant "gambles for the recovery of his investment on the motivation, success and efforts of each of his recruits over whom he has no control in any real sense." *Id.* at 848. The Federal Trade Commission recognizes that such programs are lotteries and not investments because "participants are induced to invest substantial sums of money on the possibility that by the activities and efforts of others, over whom they exercise no control or direction, they will receive the profits described * * *." *In re International Safe-T-Trac, Inc.,* 79 *F.T.C.* 318 (1971). The receipt of profits has no connection to the skill and effort of the individual investor but rather "is the result of elements of chance including the number of prior participants

and the degree of saturation of the market which exists when the participant is induced to make his investment." *Ibid.*

By contrast, an investor in a corporation has control over management in the sense that if the investor is displeased with management, that investor may vote to remove management, no matter how shaky or speculative the investment. In addition, a corporate shareholder can exercise his or her rights of dissent and appraisal or can sell the shares on the open market, thereby receiving the cash value of those shares and sending management a message of dissatisfaction. Those who contributed money to the Co–Op scheme had nothing even remotely resembling the rights of legitimate investors. Instead, they committed their money to a scheme in which the receipt of "dividends" depended on the successful recruiting of others in the correct numerical combination. As a practical matter, for any of the Co–Op investors to receive a "dividend," let alone exercise any of the same rights that a legitimate investor has, was impossible. Realistically, a participant in a pyramid swindle, aside from being foolish, depends on the blind chance that enough other dupes will be found to support a payout.

The identification number given to each participant "represented" the chance of winning in the Sanderses' pyramid scheme. The identification number's placement on the chart determined the likelihood of a participant's recovery. The identification number made the chart location tangible, serving the dual purposes of allowing participants to claim their prizes and camouflaging their winnings from the Internal Revenue Service. The participants in Co–Op knew that their locations in the scheme determined their chances, and that the placement of their identification numbers allowed them to estimate their chances of recovery. To say that the representations or particular media employed prevented this gambling operation from comprising an illegal lottery is hypertechnical. The numbers on the charts displayed to the audience at each Co–Op meeting, in combination with the identification cards

given to each investor, were more than adequate to bring this contest of chance within the lottery proscription.

Regrettably, a large number of New Jersey residents, having been defrauded of their monies by Lois and Donald Sanders, have proven again the validity of Barnum's quip: "There is a sucker born every minute." A.H. Saxon, *P.T. Barnum: The Legend and the Man* 1 (1989). The participants in the Sanderses' lottery took chances. In New Jersey, however, to sell to the public chances represented by numerical combinations is illegal. Our laws do not yet permit people such as Lois and Donald Sanders to make their livings by hoodwinking others into buying such foolish chances.

Heretofore this Court has recognized the breadth of the State's measures to protect the public, realizing that the criminal mind has seemingly inexhaustible ingenuity in its adeptness at designing lottery schemes that disguise their true nature. The definition of a lottery set forth in the statute over the years has been intentionally broad to thwart the myriad attempts to circumvent the proscription against illegal lotteries. In *Lucky Calendar Co. v. Cohen*, 19 *N.J.* 399, 410, 117 *A.*2d 487 (1955), the Court observed that the powerful temptation of easy money and enormous profits attracts those who would use their cunning to prey on society's natural weaknesses. Each case by definition presents different facts and circumstances, thus increasing the difficulty in discovering the true nature of the illegal game of chance. The goal of each illegal lottery is to disguise the scheme, avert suspicion, and thus avoid the strictures of previous understandings of lotteries. The Sanderses were able to fool both the public and the courts by obscuring the true nature of their lottery sham. We ought to recall the lengthy history of the efforts to eliminate illegal lotteries, which is still relevant today:

> Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community: it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.
>
> [*Phalen v. Virginia*, 49 *U.S.* (8 How.) 163, 168, 12 *L.Ed.* 1030, 1033 (1850).]

Defendants once pleaded guilty to running a criminal lottery. *Sanders, supra,* 212 *N.J.Super.* at 601–02, 515 *A.*2d 1256. Had they not received unauthorized sentences, those earlier convictions would stand today. *State v. Sanders,* 107 *N.J.* 609, 622–23, 527 *A.*2d 442 (1987). Neither the courts involved nor counsel thought the question of whether those pleas had a sufficient factual basis was worthy of consideration. Now, after an extended trial at considerable public expense, the Court has apparently concluded that the Sanderses' pyramid swindle is but another form of legitimate but risky investment, not an illegal game of chance. I disagree.

GARIBALDI, J., joins in this opinion.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK and STEIN—4.

*For reversal*—Justices O'HERN and GARIBALDI—2.