LUCKY CALENDAR CO., INC., PLAINTIFF-RESPONDENT,
v. MITCHELL H. COHEN, COUNTY PROSECUTOR, CAMDEN COUNTY, DEFENDANT-APPELLANT.

Argued September 27, 1955—Decided October 24, 1955.

400

Mr. *Ralph L. Fusco*, Deputy Attorney-General, argued the cause for the appellant (*Mr. Grover C. Richman, Jr.*, Attorney-General; *Mr. David M. Satz, Jr.*, Deputy Attorney-General, on the brief).

Mr. *James E. Fagan* argued the cause for the respondent (*Messrs. Gilhooly, Yauch & Fagan*, attorneys).

The opinion of the court was delivered by

VANDERBILT, C. J.  This appeal was taken by the defendant to the Appellate Division of the Superior Court from a declaratory judgment of the Law Division of the Superior Court in favor of the plaintiff declaring that its Lucky Calendar sales promotional program was lawful and not a lottery within the prohibition of the Lottery Act, *N. J. S.* 2A:121-1 *et seq.* We certified the matter while pending below.

## I.

The plaintiff, Lucky Calendar Co. Inc., an organization engaged in the business of promotional advertising, brought this action seeking a declaratory judgment under *N. J. S.* 2*A*:16–50 *et seq.*, determining that its sales promotional program bearing its trade-mark "Lucky Calendar" is not a lottery within the prohibition of the Lottery Act, *N. J. S.* 2*A*:121–1 *et seq.*, or an activity in violation of the Raffles Licensing Law, *R. S.* 5:8–50 *et seq.*, or any other criminal statute of this State. This action grew out of the fact that the defendant, the County Prosecutor of Camden County, when he learned of the proposed sales promotion planned by the plaintiff for the Acme Super Markets operated by the American Stores Company within his county, advised the plaintiff that the scheme was of doubtful validity and appeared to have the characteristics and elements of a lottery within the prohibition of our law; and that the plaintiff and its customer, the American Stores Company, would be subject to criminal proceedings, if the "Lucky Calendar" was sponsored and conducted in Camden County. In order to avoid exposing itself and its customer to the operation of our criminal laws, it instituted this action. In answer to the complaint the county prosecutor denied that the proposed activity is a lawful sales promotion and that it does not violate the Lottery Act or the Raffles Licensing Law. The parties stipulated the facts in lieu of taking testimony and the matter was submitted to the trial court for determination on the counter motions for summary judgment.

Inasmuch as the factual situation presented here is novel in this State, we have made a more extended analysis of the plaintiff's scheme than would otherwise be necessary. The facts are undisputed.

The plaintiff has a contract with the American Stores Company to introduce and operate the "Lucky Calendar" promotional advertising program in its 278 super markets and retail stores in this State.

404

A "Lucky Calendar" consists of three large sheets of paper about 18″ x 12″ in size, attractively printed in color and bound ·in calendar fashion, each sheet showing the days of a month, the three sheets together providing a calendar for three consecutive months of the year. The calendar proper is centered at the upper part of the lower half of each of the three sheets and occupies approximately one-sixth of the printed page. It is bordered on the sides and below it with from eight to ten coupons, which are appropriately scored for easy tearing, advertising such wonderful bargains as a genuine top quality retractible ball point pen of the value of $1.69 for only 19¢, if the "Lucky Calendar" householder presents the coupon at an Acme store and purchases, during the three-month period covered by the calendar, a four-ounce jar of Ideal brand instant coffee. In some instances the coupon holder need only present the coupon without making any other purchase in order to avail himself or herself of the bargain offered. It is of particular note that the items offered are of the type that have unusual appeal to the housewife.

The entire upper half of each sheet contains an explanation of the "Lucky Calendar Prize Contest," telling how the calendar holder has a chance to win "every month at every Acme super market" three wonderful prizes. Each month there is a first, second and third prize and these prizes are attractively pictured on the top half of the calendar sheet.

In the exhibit contained in the record the prizes are all Westinghouse appliances of the type desired by most modern housewives to ease her burden and add to her leisure time— a portable dishwasher, an automatic clothes dryer, a television set, an electric roaster and cooker, a vacuum cleaner, a floor polisher and a clock radio. But we take judicial notice of the fact that the prizes are not in any way limited to this brand of manufacture or type of merchandise. In the contests presently being conducted in other counties of this State, such prizes as a mink stole, a set of dishes, a knife

sharpener and a meat slicer and, last but not least, a Cadillac automobile, are presently being offered and in due course delivered. Across the middle of each page separating the description of "Lucky Calendar Prize Contest" and the calendar and the eight or more coupons, is an alluring declaration in bold type that "This Acme Lucky Calendar is worth $69.19 to you in money saving coupons," the words "worth $69.19 to you" being printed in color.

In the upper right hand corner of each sheet is a conveniently perforated coupon with a place for the name, address and telephone number of the participant in the contest. By the instructions the Lucky Calendar recipient is directed to fill in the blank spaces provided with appropriate information, clip or tear out the coupon and "take it to your nearest Acme Super Market, and deposit it in the big Prize Contest Box" before a certain time limit. The coupon itself instructs him to "deposit this coupon in the big Prize Contest Box just inside the door of your favorite Acme Super Market," but it is stipulated that the householder is not required to deposit the contest coupon himself and that anyone may place it in the contest prize box for him, although nothing to this effect appears printed on either side of the calendar. There is no special number on the coupon and the recipient does not retain any receipt for his entry. At the time designated in the Lucky Calendar the winners are drawn in each store. The first coupon drawn wins the first prize, and so on in the order advertised. There is no requirement to buy anything and a person need not be present at the drawing in order to win. The names of the winners are not posted at the stores; the winners are notified by telephone or mail and the prize is delivered to the winner free of any charge.

On the reverse side of each calendar sheet is a complete explanation of the "Acme Lucky Calendar" and its use. It describes how

"Every participating ACME Supermarket will have its own complete set of prizes. So you see, you're not competing against the whole city—but just your own neighborhood. That means a better chance of winning one of these valuable prizes."

It explains in glowing terms "how can you enter":

"It's easy! In the upper right hand corner of each calendar page is a prize contest coupon. You can detach this AT ANY TIME DURING THE MONTH. Fill in your name, address and telephone number, and deposit the coupon in the prize contest entry box just inside the door of your *nearest* ACME Supermarket. There's nothing to buy. You don't have to be present at the drawing to win. Names will be drawn on the first Saturday after the end of each month, and winners will be notified by phone or mail. Each month there is a new contest with a complete new set of prizes."

It also describes "how can you save money":

"On each calendar page there are eight or more special money-saving coupons redeemable on quality products you'll find in your ACME Supermarket. With the exception of the coupons for the NEW WONDER BOOK CYCLOPEDIA, you can use any of the other coupons on all three pages at any time during February, March and April. The ACME LUCKY CALENDAR coupons actually save you 53.5% of the retail price of reliable and guaranteed merchandise."

Although the calendar makes a point of stating "There's nothing to buy," the coupon must be deposited inside the door of the *"nearest* ACME Supermarket" and the coupon holder is urged in a starred paragraph:

"Look for special display of Acme Lucky Calendar coupon products!"

The obvious design of the entire Lucky Calendar, while it avoids saying so in so many words, is to get the calendar holder, by participating in the Lucky Calendar scheme, into the nearest Acme Supermarket for the purpose, of course, of increasing its sales.

The plan contemplates "saturation mailing"; the Lucky Calendar is delivered by post to each householder or family within the given market area. None of these calendars are distributed at the supermarkets or stores nor can anyone obtain a Lucky Calendar by requesting it at the Acme supermarket.

The Lucky Calendar promotional program insofar as it applied to that portion conducted in the Philadelphia metropolitan area appeared to be acceptable to the Post Office Department of the United States Government. A letter made part of the record indicates:

"According to your letter, 'The calendar will be mailed to persons whose names appear on a mailing list, such as one prepared from automobile registrations or they may be addressed to "Occupant" at various addresses in the Philadelphia metropolitan area. All calendars will be distributed in this manner. None will be distributed or otherwise "handed out" at the Acme Super-markets.'

You state further that the sponsor will advertise the prize drawings as part of its regular advertising program: 'These advertisements will explain the plan and will not state that winners must be present at the drawing in order to win the prizes.'

According to the rules there is no requirement that participant attend the drawing, and winners are to be notified by telephone or mail.

Matter relating to this plan appears to be acceptable for mailing insofar as Section 36.6 Postal Laws and Regulations of 1948, (18 *U. S. C.* 1302) is concerned, it being understood that there is to be no consideration furnished in order to receive a coupon or otherwise participate in the awarding of the prizes."

At the time of oral argument there was presented to the court a "Lucky Calendar" somewhat different in form from the one in the record. It has a contest coupon for every week for a period of 13 weeks instead of one a month for the period of three months. The participant is required to fill in the last line of a four-line jingle and then follow the same procedure as in the other Lucky Calendar form. The following description of this variation of the program appears:

"Here's how to use your contest coupons.

Here are the simple rules:

1. Fill in your name, address and telephone number in the space provided in each coupon. Note that there is a coupon dated for each of the 13 weeks of the contest. Employees of participating companies are not eligible. Contest weeks are printed in red. Do not use a coupon for any week other than that indicated as the current one.

2. Clip or tear out this coupon, making sure that it is the right one by checking the date. Turn it over, and there you'll find 3 lines of a 4-line verse. Fill in what you think would be an appro-

priate 4th line. Originality, neatness, etc. mean more than ability to write poetry, so everyone has a real chance to win. Duplicate prizes will not be awarded, and the opinion of the judges will be final.

3. Take the coupon to the nearest Acme store, and deposit it in the Prize Contest Box just inside the door. Be sure to do it on or before the date indicated on the coupon. You are not required to buy anything in order to participate.

4. Watch your local newspaper(s) for notice of the time and TV station on which the announcement will be made of the winning verses. However, you do not have to be present, or even to be watching, to win. If you have properly filled in your name, address and telephone number, you will be notified as promptly as possible.

American Stores Company employes are not eligible to participate in the contest."

The prizes advertised are 12 Cadillacs, 92 mink stoles and 1,800 additional prizes. Except for these differences the program is substantially the same.

The most important facts concerning the pending case remain to be stated. They are that the food industry is not only the largest in the country, absorbing a considerable amount of the income of every family, but it is also the industry that has shown the greatest evolution over the last half-century in its methods of marketing—from the corner grocery store to the chain store and from the chain store to chains of super markets. This evolution has been justified on the ground that it gives the people standardized merchandise at cheaper prices than was possible in earlier times. It has been hailed as the outstanding example of legitimate free competition, permitting the people to shop for their food supplies where they can buy goods of known quality for the lowest price. The proposed scheme of advertising injects into a natural free market dealing with basic commodities of everyday living all of the distracting consequences of a lottery.

## II.

█ █ In this case there is a *bona fide* justiciable controversy as to the legal right of the plaintiff to engage in the kind of activity discussed herein, although we should note in

passing that the American Stores Company is equally involved. The duty of the defendant to prosecute violations of the criminal laws of this State within his county is clear, *State v. Winne*, 12 *N. J.* 152 (1953). Accordingly, there are present the necessary elements for a declaratory action, *Borchard, Declaratory Judgments (2d ed.* 1941), *chapter* II. The salutary purposes contemplated by the Declaratory Judgments Act, *N. J. S.* 2A:16–50 *et seq.*, are clearly served when such conflicting interests are determined without the necessity of compelling the plaintiff to expose itself and its customer to the risk of criminal prosecution. The advantages of such a proceeding are summarized in *Borchard, supra*, at *page* 1020:

"The criminal prosecution is at best a crude weapon of social control. While it may be the only instrument available to punish and exercise, if possible, the major offenses against society, it is quite unsuited to the more subtle adjustments of competition, business practice and regulation which mark the impact of modern industry and business on all classes of society. What is here needed is not the policeman's club but the arbitrator's and traffic manager's refinement and direction of legislative correctives in the light of social need. The criminal trial is hardly the forum for making such adjustments, and for arguing out the shadowy and movable line between the permissible and the unprivileged practice."

See also *Borchard, supra, page* 1028, under heading of *Lotteries; Abelson's, Inc., v. New Jersey State Board of Optometrists*, 5 *N. J.* 412, 416–418 (1950). It is unfortunate, however, for the plaintiff and its customer, American Stores Company, that they did not await the decision of this court before embarking on its promotional program in various counties of this State, for we reach a conclusion opposite to that of the learned trial judge. The same reasons which led the plaintiff to seek a declaratory judgment should have led it to await the outcome of an appeal, for one may not ward off a criminal prosecution by gambling on the ultimate outcome of a suit for a declaratory judgment. *Borchard, supra, p.* 1022. *Cf. Reed v. Littleton*, 275 *N. Y.* 150, 9 *N. E. 2d* 814 (*Ct. App.* 1937).

■ In deciding whether the facts in the case at bar constitute a lottery, we must resort to the accepted method of determining the meaning of a statute: we must look first to the mischief to be remedied and then to the means taken by the Legislature to achieve that end.

In colonial days and in the early years of the Republic lotteries were authorized for such worthy causes as churches, colleges and schools, but we are told in *Dombroski v. State,* 111 *N. J. L.* 546, 548 (*Sup. Ct.* 1933), that lotteries even extended to such dubious objects as enabling a turnpike company to raise money by a lottery to pay its debts, the court remarking:

> "By 1797, the lottery scheme must have been too much of a good thing because, the Legislature passed an act declaring a lottery a common nuisance, and those participating punishable therefor. *Pamph. L. p.* 166."

See also *Bender, Tickets to Fortune, the Story of Sweepstakes, Lotteries and Contests, chap.* 20 (1938).

Of all the forms of gambling, lotteries have been the most condemned by the courts. Over a century ago the United States Supreme Court unanimously condemned their anti-social effects in comparison with ordinary gambling in sweeping terms that reflected judicial experience generally with lotteries:

> "Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community: it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple." *Phalen v. Commonwealth of Virginia,* 8 *How.* 163, 168, 12 *L. Ed.* 1030, 1033 (1850)

The lure of the chance for "easy money" has not changed in the intervening century. The enormous profits to be had from lotteries have attracted the devious ingenuity of those who seek to profit by catering to the weakness of those whom the statute aims to protect, primarily for the benefit of society

in general. As Chief Justice Warren well put it in the recent case of *Federal Communications Commission v. American Broadcasting Co., 347 U. S.* 284, 292, 293, 74 *S. Ct.* 593, 98 *L. Ed.* 699 (1954):

"Law enforcement officers, federal and state, have been plagued with as many types of lotteries as the seemingly inexhaustible ingenuity of their promoters could devise in their efforts to circumvent the law. When their schemes reached the courts, the decision, of necessity, usually turned on whether the scheme, on its own peculiar facts, constituted a lottery. So varied have been the techniques used by promoters to conceal the joint factors of prize, chance, and consideration, and so clever have they been in applying these techniques to feigned as well as legitimate business activities, that it has often been difficult to apply the decision of one case to the facts of another."

So myriad are the forms that lotteries have assumed, so varied the subterfuges attempted to bring them within the letter of the law that our Legislature has been driven to use the broadest terms in describing the crime. *N. J. S.* 2A:121–1 provides that:

"Any person who:
   a. *Gives,* barters, sells *or otherwise disposes of, or offers to give,* barter, sell or otherwise dispose of, a ticket or any share or interest in a ticket in a lottery, whether erected, set up, opened or made in this state or elsewhere, or the chance of any such ticket; or
   b. Issues a policy of insurance, or insures or receives any consideration for insuring for or against the drawing of any ticket or number, or any share or interest in a ticket, in a lottery; or
   c. Receives money or any thing of value in consideration of an agreement to repay a sum of money, or to deliver any goods or thing in action if a ticket or any share of a ticket in a lottery proves fortunate or unfortunate, or is drawn or not drawn on a particular day or in a particular order; or
   d. Promises or agrees to pay a sum of money or to deliver any goods or thing in action, or to do or forbear to do anything for the benefit of another person, upon an event or contingency dependent on the drawing of a ticket or number, or any share of a ticket, in a lottery—
   Is guilty of a misdemeanor." (Italics supplied.)

The other sections of the act relate to various lottery offenses, such as advertising lotteries, possession of lottery

paraphernalia, and transmitting messages relating to lotteries, and the proof necessary to sustain a lottery conviction. The general statute alone need concern us here.

While it is to be especially observed that the statute makes no attempt to define a lottery, it has often been said in the decisions that there are three essential elements of a lottery: (1) the distribution of prizes, (2) according to chance, (3) for a consideration. See *Federal Communications Commission v. American Broadcasting Co., supra,* 347 *U. S.,* at *page* 290. The first two elements are concededly present here, but it is argued that the third, consideration, is not. But is consideration a necessary element of the crime of lottery under our statute? To so hold would be, in effect, to delete the very first word, "gives," in *N. J. S.* 2A:121–1(*a*), *supra,* as well as the words "or otherwise disposes of, or offers to give * * * or otherwise dispose of." Where the Legislature has gone to such lengths as it has here to achieve a desired objective, we are bound in the process of statutory construction to give due weight to every word employed by it in an effort to give effect to the legislative intent. The words quoted from the statute clearly negative any notion of the necessity of consideration as an ingredient of a lottery; we can conceive of no words that could be better chosen by the Legislature to make this idea manifest. Nor is there anything new in this view of a lottery, for it is to be observed that Dr. Johnson's definition of a lottery, quoted with approval by Chief Justice Beasley in *State v. Shorts,* 32 *N. J. L.* 398, 401 (*Sup. Ct.* 1868), does not mention consideration: "A lottery is a game of chance; a distribution of prizes by chance." Accordingly, if it were necessary to prevent a lottery, we should not hesitate to place our decision solely on the ground that consideration is not a necessary element of a lottery, that a lottery may arise by "a gift or offer of a gift or otherwise than by way of barter and sale," without consideration and that the essence of a lottery is as stated by Chief Justice Beasley in *State v. Shorts, supra,* 32 *N. J. L.,*

at *page* 401, after quoting with approval Dr. Johnson's definition of a lottery:

"This ingredient of chance is, obviously, the evil principle against which all prohibitory laws are aimed."

The view that consideration is unnecessary to find a lottery has ever been accepted in jurisdictions in which the statute does not contain language similar to the quoted words of the New Jersey statute. Thus in *State v. Dorau,* 124 *Conn.* 160, 198 *A.* 573, 577 (*Sup. Ct. Err.* 1938), it was stated by Chief Justice Maltbie:

"Our statute then prohibits not merely lotteries in the strict sense of the term, but certainly covers enterprises of the general nature of lotteries wherein chance is the predominating element, even though those who participate directly risk no money or property of their own."

and this in face of a statute which merely read:

"Any person who shall set up any lottery to raise and collect money or for the sale of any property or shall, by any kind of hazard, sell or dispose of any kind of property or set up a notification to induce people to bring and deposit property to be disposed of in any such manner or to risk their money or credit for the purpose of any such sale or disposition, shall be fined not more than one hundred dollars or imprisoned not more than one year."

Recently in *Herald Publishing Co. v. Bill,* 142 *Conn.* 53, 111 *A. 2d* 4, 8 (*Sup. Ct. Err.* 1955), where a scheme identical with the one before us was condemned on the ground that chance was the predominating element even though the participant risked no money, Mr. Justice Baldwin in construing the same statute aptly said:

"If the plan proposed by the corporation were put into effect, the result, in the final analysis, would be to arouse the desire to gain something for nothing and play upon other instincts inimical to sound public policy. As we pointed out in the *Dorau* case, *supra*, the legislature has manifested an intent to discountenance activities exploiting such desires and instincts. The bank night plan and the instant plan are both designed to encourage patronage. They

possess essentially the same type of appeal and use the same technique for stirring up public interest. The cases cannot be distinguished on their facts."

Likewise in *Society Theatre v. City of Seattle*, 118 *Wash.* 258, 203 *P.* 21 (*Sup. Ct.* 1922), the court had before it an ordinance which provided:

"It shall be unlawful for any person to open, conduct, maintain or carry on, or be in any manner connected with, any lottery or any establishment or business, by whatever name it may be known, wherein any property is sold or disposed of by chance."

While holding that upon the facts before it the defendants had conducted a lottery, the court went on to point out that the ordinance was broader than a strict prohibition of lotteries, and said (118 *Wash.* 238, at *page* 260, 203 *P.* 21, at *page* 22) that:

"* * * it is perfectly plain to us that the business of respondents, carried on as it is, comes directly within the inhibition of the ordinance, because respondents are directly connected with a business where 'property is sold or disposed of by chance.' This ordinance is broad."

In *City of Wink v. Griffith Amusement Co.*, 129 *Tex.* 40, 100 *S. W.* 2d 695, 701 (*Tex. Sup. Ct.* 1936), the court in considering the provision of the *Constitution of Texas, art. 3, sec. 47, Vernon's Ann. St.*, which condemned the operation of "lotteries, gift enterprises or other evasions involving the lottery principle," said:

"But the Constitution condemns those things which fall short of containing all the essential elements of a lottery, namely, those things which involve the lottery principle, of which 'chance' is the one which constitutes the very basis of a lottery, and without which it would not be a lottery."

But we do not have to rest our decision on this construction of our statute alone as negativing the need for consideration to find a lottery, for consideration is in fact clearly present here, both in the form of a detriment or in-

convenience to the promisee at the request of the promisor and of a benefit to the promisor. It is hornbook law that if the consideration is sufficient to sustain a simple contract (if otherwise legal), it is sufficient to satisfy this third alleged element of lottery. Although the payment of money or a promise to pay money was the form that consideration generally took in the early days of lotteries, the consideration in a lottery, as in any form of simple contract, need not be money or the promise of money. Nor need it be of intrinsic value; "a rose, a hawk or a peppercorn" will suffice, provided it is what is asked for by the promisor and is not illegal. The law will not inquire as to the adequacy of consideration when the thing to be done is asked to be done, be it ever so small. *Williston on Contracts* (*rev. ed. 1936*), *sec. 115*. Whether a "peppercorn" or the filling in and delivering of a coupon is sufficient consideration for a promise depends only on whether it was the requested detriment to the promisee induced by the promise. That is consideration which is regarded as such by the parties. *Ibid, sec. 100, fn. 8*; *Restatement of the Law, Contracts, sec. 75*. These views are reflected in the "Payme" case, *State v. Berger*, 126 *N. J. L.* 39, at *pages* 42–43 (*Sup. Ct.* 1941), where Mr. Justice Perskie held:

"The 'valuable thing' to defendant was the extra trade, the extra admission charges of thirty cents, which the playing of the game, as advertised, would and apparently did attract. Each player took the chance of getting some thing of value in addition of that of seeing the picture. How much of each thirty cents was paid for seeing the picture and how much for the opportunity to participate in the game to win a credit voucher is, of course, not made to appear. But obviously some portion thereof constituted the fund out of which the credit vouchers were paid.

The awarding of the credit vouchers was not the awarding of a mere gratuitous 'prize or premium.' The reliance upon the result of hazard is clear. In our opinion defendant clearly violated both the spirit and the letter of the act. *Cf. Wooden v. Shotwell, Err. & App.*, 24 *N. J. L.* 789, 795; *Market Plumbing & Heating Supply Co. v. Spangenberger*, 112 *N. J. L.* 46, 169 *A.* 660, affirmed 114 *N. J. L.* 271, 176 *A.* 342.

In reaching the stated result we have not overlooked the fact that some 25 or 30 persons were permitted to enter the lobby and

play the game without having purchased a ticket of admission. On the contrary, our result is strengthened thereby. For however ingenious, the stated circumstance is nothing other than a subterfuge, a brazen artifice employed for the clear purpose of thwarting the enforcement of the criminal law. The law reaches beyond the outer form and takes hold of the substance of the thing in issue, and consequently no dressing, however adroit, can make legal that which is illegal. *Cf. State v. Shorts*, 32 *N. J. L.* 398, 402."

And likewise in *Furst v. A. & G. Amusement Co.*, 128 *N. J. L.* 311, at *page* 313 (*E. & A.* 1942), the "Bank Night" case, where Mr. Justice Parker said:

"A lottery, in the illegal aspect, implies a consideration which at common law would support a contract; and it is elementary that such consideration may be either some benefit to the promisor or some inconvenience to the promisee. In the class of cases similar to that now before us—and there are a large number in the reports—an avowed object, and the inducement to a theatre proprietor to sign one of these contracts, is to stimulate the patronage of his theatre by catering to the natural gambling instinct of humanity in general. Those that pay to attend the performance may well be induced to do so when registering their names, by the prospect of hearing their names called and responding promptly. Those that have not paid for admission to the motion picture must at some inconvenience wait outside to be sure of hearing the announcement and of entering the theatre promptly thereafter."

Viewing the element of consideration in the aspect most favorable here to the plaintiff—that the participant need not come to the Acme stores; that he need purchase nothing; and that he need pay nothing for the Lucky Calendar—still, sufficient consideration exists in the form of completing the coupon and arranging for the deposit of it in the box "just inside the door of his nearest Acme Supermarket."

Quite apart from having obtained from the promisee something to which the promisor had no previous right, thereby obtaining a benefit, *Williston, supra,* 102, 102A, it is transparently clear that the real benefit which the plaintiff and its customer, American Stores Company, were seeking—and in fact has been obtaining—is an increase in volume of business. The whole advertising scheme is artfully directed to enticing customers to the Acme supermarkets to the re-

sultant benefit of American Stores Company and incidentally of the plaintiff. The motives of the plaintiff and its customer, American Stores Company, are in nowise altruistic. Somebody must pay for the program and the prizes—and the ultimate bearer of the burden is of course the "lucky" calendar holder.

The plaintiff relies on the recent decision of the United States Supreme Court in *Federal Communications Commission v. American Broadcasting Co.*, 347 *U. S.* 284, 74 *S. Ct.* 593, 98 *L. Ed.* 699 (1954). The decision of that court appears to have been largely influenced by the relatively recent departmental determinations of the Attorney-General and the Postmaster-General and the failure of Congress to enact legislation overriding their views with respect to a federal statute. These departmental rulings are a wide departure from the unrestrained condemnation of lotteries by the United States Supreme Court in *Phalen v. Commonwealth of Virginia*, 8 *How.* 163, 168, 12 *L. Ed.* 1030, 1033 (1850), which has never been overruled. In contrast it must be borne in mind that we are here dealing with the broadest kind of state statute that legislative language could devise to prevent lotteries and one that has been carefully construed by our courts to give effect to the clear legislative intent against lotteries by whatever course of legal reasoning that may have been employed to reach the result of enforcing the statute. Here we have no administrative rulings casting doubt on the clear intent of the statute. The underlying facts in the instant case, moreover, are quite different from those confronting the United States Supreme Court and, as Chief Justice Warren well said:

"* * * it has often been difficult to apply the decision of one case to the facts of another." (347 *U. S.*, at *page* 293), 74 *S. Ct.* at *page* 599.

Here we have a scheme and a field of operations quite different from that involved in the radio and television "giveaway" programs of the *American Broadcasting Co. case*, *supra*. It is manifestly not in the public interest to permit

the element of chance to control such a vital commodity as food, far-reaching as it is in its effect on the national economy. To do so, in the largest industry in the country would be to encourage a battle of industrial giants for increased business to the detriment of the public. Security and Exchange registrations, the Blue Sky laws, and regulations against prizes in Alcoholic Beverage Control administrations are but three examples among many of modern legislation designed to prevent the deleterious social effects which naturally arise where people are not in fact able to deal on an even basis either because of ignorance or inability to grasp the facts. We have sought here to effectuate the purpose of the statute by eliminating the element of chance which Chief Justice Beasley and others pointed out was the very essence of the vice of a lottery from the standpoint of the general welfare. This is especially necessary in a field where such a fundamental commodity as food is concerned.

It remains to dispose of the second type of Lucky Calendar giving away mink coats and Cadillacs. There, to become a participant, one has to add a fourth line to a three-line jingle. This variation does not make the scheme any less objectionable. On the contrary, the participants are asked to do an additional act which for many might prove difficult. Some of the cases have expended considerable ingenuity in deciding that such a requirement for winning a prize leaves the awarding of prizes to the uncontrolled decision of the judges of the contest, *Pickett, Contest and Lottery Laws,* 45 *Harv L. Rev.* 1196, 1211, 1212, and cases cited in *footnote 55,* and so comes within the condemnation of *State v. Shorts,* 32 *N. J. L.* 398, 401 (*Sup. Ct.* 1868). It seems simpler, however, to dispose of the matter by merely observing that here the consideration, if consideration be necessary, is greater than in the Lucky Calendar describing the Westinghouse prizes.

Both devices are illegal under the Lottery Act, *N. J. S.* 2A :121–1 *et seq.* The judgment below is accordingly reversed and application of this decision is extended to both types of Lucky Calendar.

HEHER, J., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice OLIPHANT—1.