882 F.2d 748
 Richard F. BIEGENWALD, Appellant,
v.
William H. FAUVER, both individually and in his official
capacity as the Commissioner of the New Jersey Department of
Corrections; Howard L. Beyer, both individually and in his
official capacity as the Warden of Trenton State Prison;
and W. Cary Edwards, both individually and in his official
capacity as the Attorney General of the State of New Jersey,
and his predecessors.
 No. 88-6002.
 United States Court of Appeals,
Third Circuit.
 Submitted May 11, 1989.
Decided Aug. 11, 1989.
As Amended Aug. 18, 1989.
 
 Richard F. Biegenwald, Trenton, N.J., pro se.
 Mary C. Jacobson, Mary F. Rubinstein, Deputy Attys. Gen., Peter N. Perretti, Jr., Atty. Gen. of New Jersey, Trenton, N.J., for appellee.
 Before COWEN, Circuit Judge, GARTH and SEITZ*, Senior Circuit Judges.
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 Richard Biegenwald, a prisoner in the New Jersey State prison system, asserts in this lawsuit that his constitutional rights were violated when the defendants continued to confine him on "death row" in Trenton State Prison after his sentence of death was vacated by the New Jersey Supreme Court. The district court abstained from adjudicating Biegenwald's claims pending the resolution of certain state law issues in a state forum, applying the abstention doctrine announced in Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Biegenwald appeals from the order administratively terminating his federal lawsuit. Because we conclude that it was not appropriate to apply the Pullman abstention doctrine in this lawsuit, we will reverse the order of the district court and remand this case to that court for further proceedings in accordance with this opinion.
 
 I.
 
 2
 Richard Biegenwald was convicted of first degree murder on December 7, 1983, and was sentenced to death for that crime on December 8, 1983. After receiving the sentence of death, Biegenwald was transferred from the general population in Trenton State Prison to the "Capital Sentence Unit," a more restrictive prison unit for inmates facing sentences of death.
 
 
 3
 Biegenwald appealed his conviction and sentence, and on March 5, 1987, the New Jersey Supreme Court affirmed his conviction, but vacated the sentence of death, and ordered that Biegenwald be accorded a new sentencing hearing. According to Biegenwald's complaint, he submitted written requests to the defendants on June 16, 1987, August 1, 1987, and September 4, 1987, asking that he be transferred from the Capital Sentence Unit to the general population because his sentence of death had been vacated. The defendants did not respond to these requests, and Biegenwald filed this lawsuit on May 6, 1988, pursuant to 42 U.S.C. Sec. 1983, seeking injunctive relief and monetary damages for the alleged constitutional deprivation arising from Biegenwald's continued confinement in the Capital Sentence Unit.
 
 
 4
 The defendants transferred Biegenwald to the general prison population in August, 1988, which mooted his request for injunctive relief. He continues to press this lawsuit, however, seeking monetary damages for what he asserts was an unconstitutional confinement on New Jersey's death row from March 5, 1987 until August 1988, a period of approximately one and one-half years. Defendants, in their brief before this Court, note that Biegenwald has since been resentenced to death, and is once again confined in the Capital Sentence Unit.[1]
 
 
 5
 The district court referred the defendants' motion for an order of abstention to a federal magistrate, who filed a report and recommendation recommending that the motion be granted on July 29, 1988. Biegenwald filed objections to the report and recommendation, and the district court, after considering Biegenwald's objections, ordered on October 4, 1988, that his case be administratively terminated pending the "initiation and outcome of state court proceedings." Biegenwald's motion to amend or alter this order was denied by the district court by order entered November 29, 1988. Biegenwald filed a timely notice of appeal from this order on December 22, 1988. An order administratively terminating a lawsuit pending the resolution of state court proceedings is considered a final and appealable order, Hovsons, Inc. v. The Secretary of the Interior of the United States, 711 F.2d 1208, 1211 (3d Cir.1983) (citing Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)), and we therefore have jurisdiction over this appeal under 28 U.S.C. Sec. 1291.
 
 II.
 
 6
 As we have noted previously, "[a]bstention from the exercise of federal jurisdiction is, in all its forms, 'the exception, not the rule.' " United Servs. Auto. Ass'n v. Muir, 792 F.2d 356, 360 (3d Cir.1986) (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)), cert. denied, 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987). Indeed, we stated in Muir that abstention "is an extraordinary and narrow exception to the district court's duty to adjudicate a controversy properly before it, justified only in the exceptional circumstances where resort to state proceedings clearly serves an important countervailing interest." Id. at 360-61. Pullman abstention, which the defendants assert is appropriate here, instructs "that federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." Id. at 361 (quoting Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984)).
 
 
 7
 We undertake what is essentially a two-step analysis when reviewing a district court's abstention decision. The first step involves determining whether the facts and legal issues presented in the case bring the case within the "special circumstances" required for application of the abstention doctrine. D'Iorio v. County of Delaware, 592 F.2d 681, 686 (3d Cir.1978). For a claim that Pullman abstention is appropriate, three "special circumstances" must generally be present:
 
 
 8
 First, there must be uncertain issues of state law underlying the federal constitutional claims brought in federal court. Second, these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important state policies.
 
 
 9
 Id.
 
 
 10
 Once it is determined that the three "special circumstances" are present, the district court makes a discretionary determination whether abstention is appropriate in the particular case, based on the weight of these criteria, and other relevant factors, such as the potential impact on the parties of the delay resulting from a decision to abstain, or the availability of an adequate state procedure to have the state law questions resolved. See id.; see also Muir, 792 F.2d at 362-63 (considering the potential impact of delay on an insurance company's ability to conduct its business); 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4242, at 55-60 (1988) (noting that delay and the unavailability of an adequate state procedure are factors that can weigh against abstention).
 
 
 11
 Within this two-step framework, we apply different standards of review, depending upon the nature of the district court determination. We review the district court's assessment of the first two "special circumstances," namely whether state law is uncertain, and whether that law is amenable to an interpretation that would narrow or eliminate the constitutional issue, de novo, as these determinations are essentially legal in nature. D'Iorio, 592 F.2d at 686. The district court's decision on the third "special circumstance," namely whether an erroneous federal decision on the state law issue would be disruptive of important state policies, is also subject to appellate review. We have recognized that this review, however, is more "discretionary in character," and we will generally accord greater deference to the district court here if its appraisal is "adequately explained." Id.
 
 
 12
 Once it is determined that the three "special circumstances" are present and the case falls within the ambit of the Pullman doctrine, "the remaining question is whether the trial judge abused his discretion in weighing the advantages and disadvantages of abstention and deciding to invoke the Pullman doctrine." Id. (quoting Frederick L. v. Thomas, 578 F.2d 513, 517 (3d Cir.1978)).
 
 III.
 
 13
 With these general principles in mind, we must assess whether the district court properly invoked Pullman abstention in this case.
 
 A.
 
 14
 Biegenwald's constitutional claim does turn on the construction of a state statute. He asserts that N.J.Stat.Ann. Sec. 2C:49-6 (West Supp.1989) creates an expectation that an inmate who is not under sentence of death, or whose death sentence has been discharged, will not be housed in the Capital Sentence Unit. Thus, argues Biegenwald, any inmate not meeting the state of New Jersey's specific conditions for confining an inmate in the Capital Sentence Unit has a liberty interest in remaining with the general prison population, as opposed to being confined in the more restrictive Capital Sentence Unit. Biegenwald alleges that he was unconstitutionally denied this liberty interest without due process when the state continued to confine him in the Capital Sentence Unit following the New Jersey Supreme Court's order vacating his sentence of death.
 
 
 15
 The statutory provision at issue, N.J.Stat.Ann. Sec. 2C:49-6(a), states:
 
 
 16
 a. Within 10 days after issuance of a warrant as provided in section 5 of this act, the sheriff shall deliver the warrant, and also the person sentenced, if he is not already in the custody of the department, to the department. From the time of the delivery of the warrant and until the imposition of the punishment of death upon him, unless discharged from the sentence, the person shall be kept isolated from the general prison population in a designated State prison.
 
 
 17
 N.J.Stat.Ann. Sec. 2C:49-6(a) (West Supp.1989) (footnote omitted) (emphasis added).
 
 
 18
 Biegenwald asserts that when the New Jersey Supreme Court vacated his original sentence of death, he was "discharged from the sentence" as that term is used in N.J.Stat.Ann. Sec. 2C:49-6(a).[2] Biegenwald's reading does appear to be closer to the plain meaning of the statute than the reading proffered by the defendants, who assert that an inmate is not "discharged from the sentence" unless he no longer faces the possibility of a death sentence.
 
 
 19
 Nevertheless, both readings are plausible. Since the statute is uncertain, and is "obviously susceptible" to a construction which would obviate the need for the district court to decide the federal constitutional issue presented in this case, see Muir, 792 F.2d at 361,[3] we agree with the district court that the defendants have established the first two of the three "special circumstances" necessary to bring a case within the ambit of Pullman abstention.
 
 
 20
 We have significantly more difficulty, however, with the district court's finding of the third special circumstance, i.e. that an erroneous construction of the words "discharged from the sentence" would be disruptive of important state policies. The defendants argue that an erroneous decision on this issue would "be detrimental and disruptive to the State Corrections process." Appellees' Brief at 12. The district judge found that an incorrect decision would "disrupt important state interests in the safe operation of the prison." District Court opinion at 2.
 
 
 21
 Presumably, this disruption would occur because the state would not be permitted to confine persons who had been sentenced to death, but whose sentences were vacated upon appeal, in the Capital Sentence Unit. The appellees assert that "[s]egregating death row prisoners is done to increase security to prevent escapes of the most dangerous prisoners, and to reduce friction among inmates." Appellees' Brief at 12.
 
 
 22
 While this argument has a certain superficial appeal, any merit it might have is belied by the events of this case. The defendants transferred Biegenwald (and other similarly situated prisoners) from the Capital Sentence Unit to the general population in August, 1988. They were not under court order to transfer these prisoners, but instead did so on their own initiative, presumably for policy reasons not disclosed to this Court (or the district court). It seems disingenuous, to say the least, for the defendants to argue, on the one hand, that important state policies would be disrupted if a federal court were to hold that prisoners whose death sentences have been vacated should be housed in the general population, while they adopt a policy of housing these prisoners in the general population on their own initiative.
 
 
 23
 Additionally, we fail to see any practical distinction between a prisoner whose death sentence has been vacated, and who is awaiting resentencing, and a prisoner who has been convicted of a crime for which he may receive a sentence of death, and who has not yet been sentenced. Both would appear to present similar security and management challenges. New Jersey's statutory scheme, however, does not provide that an inmate awaiting initial sentencing be housed in the Capital Sentence Unit, even if it has been convicted of a capital crime and faces a possible death sentence.
 
 
 24
 Finally, a brief review of the regulations governing New Jersey's prisons reveals that the defendants have a variety of mechanisms available to segregate prisoners who present security or management concerns. See N.J.Admin.Code tit. 10A, Sec. 5-2 (Management Control Unit); id. at Sec. 5-3 (Administrative Segregation); id. at Sec. 5-5 (Protective Custody); id. at Sec. 5-6 (Transitional Protective Custody). The availability of these other mechanisms to deal with the security and management problems posed by inmates convicted of serious crimes, or who pose disciplinary or other security problems also undermines the defendants' assertion that important state policies would be disrupted by an erroneous federal court construction of the words "discharged from the sentence."
 
 
 25
 Although we generally give greater deference to a district court's assessment of whether an erroneous decision would interfere with important state policies, we find that in this case the district court erred when it found this third "special circumstance" to be present in this case. Where an erroneous decision would not interfere with important state policies, Pullman abstention is inappropriate. We will reverse the district court's order administratively terminating Biegenwald's case.
 
 B.
 
 26
 Even if all three special circumstances were present, however, we also find that the advantages of abstaining in this case are significantly outweighed by the disadvantages. Given the posture of the case as it is now before us, a second and independent ground for reversal is the district court's erroneous discretionary determination that abstention was appropriate.
 
 
 27
 Two additional factors weigh heavily against invoking abstention here. Most significantly, the inevitable delay engendered by requiring Biegenwald to seek a state court decision before he can adjudicate the merits of his constitutional claim would likely destroy any possibility of a remedy for those alleged violations. Biegenwald is, once again, facing a death sentence. There is a possibility that by the time this dispute winds its way through the state court system, returns to the district court, and is finally brought to trial, Biegenwald will no longer be alive. A just resolution of this case calls for Biegenwald being alive in order to testify as to any pain and mental anguish he suffered by reason of his allegedly wrongful confinement, as well as the requests that he made and responses he received relating to the continuing confinement in the Capital Sentence Unit.
 
 
 28
 Biegenwald had not been resentenced to death at the time of the district court's abstention order, and we do not say that the district court abused its discretion in balancing the advantages and disadvantages of abstention when the impending death sentence was not a consideration. The defendants, however, note that Biegenwald had been resentenced to death in their brief before this Court, and we would be remiss were we to ignore the impact of this event on the issue before us.
 
 
 29
 A second factor weighing against abstention is the uncertainty of Biegenwald's ability to obtain a state court ruling on the proper construction of the words "discharged from the sentence." New Jersey does not have a procedure by which a federal court can certify a state law question to the state system, and the New Jersey courts disfavor advisory opinions. See New Jersey Ass'n for Retarded Citizens, Inc. v. New Jersey Dep't of Human Servs., 89 N.J. 234, 241, 445 A.2d 704, 707 (1982) ("We will not render advisory opinions or function in the abstract"); Civil Serv. Comm'n of New Jersey v. Senate of New Jersey, 165 N.J.Super. 144, 148, 397 A.2d 1098, 1101 (App.Div.) (New Jersey declaratory judgment law "is not to be used to obtain advisory opinions." (quoting Lucky Calendar Co. v. Cohen, 36 N.J.Super. 300, 304, 115 A.2d 603, 605 (Law Div.1955), rev'd, 19 N.J. 399, 117 A.2d 487 (1955), reversal aff'd on rehearing, 20 N.J. 451, 454, 120 A.2d 107, 108 (1956))), certif. denied, 81 N.J. 266, 405 A.2d 811 (1979). Since Biegenwald has the right to a federal court determination of the merits of his constitutional claim, a state court asked to construe the words "discharged from the sentence" might well conclude that to issue an order stating its construction would be akin to issuing an advisory opinion.
 
 
 30
 Given the uncertain availability of a state forum in which to adjudicate this issue, and the significant possibility that the delay engendered by abstention would effectively destroy any remedy for the alleged constitutional violation, we find that the severe imbalance between the significant disadvantages and slight advantages of abstaining in this case provide an independent basis for reversing the district court's order of abstention.[4]
 
 IV.
 
 31
 For the reasons stated in this opinion, we will reverse the district court order administratively terminating this case and remand the case to that court for further proceedings in accordance with this opinion.
 
 
 32
 SEITZ, Circuit Judge, concurring.
 
 
 33
 Although I agree with the result reached by Judge Cowen, I write separately because I believe the judgment can be reversed on a narrow ground.
 
 
 34
 Pullman abstention serves no purpose if the injured party may not be able to obtain an adjudication of the merits of the state issue that forms the basis for the district court's decision to abstain. See C. Wright, A. Miller & E. Cooper, 17A Federal Practice and Procedure Sec. 4242 at 57. Otherwise stated, if there is substantial doubt that the plaintiff could obtain a construction of the New Jersey statute in question in any appropriate state proceeding, the district court should not have abstained.
 
 
 35
 In my view, it is very doubtful that the plaintiff could maintain a claim against the defendants in their official capacities because of his failure to comply with the notice provisions in the New Jersey Tort Claims Act. See NJSA 59:8-8. This is so apart from any statute of limitations problem.
 
 
 36
 Any state action against these defendants personally might well be met with a qualified immunity defense that could result in a determination that would not resolve the critical state law issue here involved. See NJSA 59:3-1, et seq., and in particular NJSA 59:3-3 which provides that "[a] public employee is not liable if he acts in good faith in the execution and enforcement of any law." See also Martin v. Township of Rochelle Park, 144 N.J.Super. 216, 365 A.2d 197, 200 (1976). I think this same doubt would extend to an attempt to secure a declaratory judgment.
 
 
 37
 Since there is a very serious doubt that plaintiff could initiate a state law action that would result in a construction of NJSA 2C:49-6, I vote to reverse the district court's abstention order. Needless to say, this action should be a priority matter in the district court.
 
 GARTH, Circuit Judge, dissenting:
 
 38
 The issue that divides this court is whether Judge Thompson of the New Jersey District Court abused her discretion by abstaining in order that the New Jersey state courts could first determine if, as a matter of state law, a "discharged sentence" as that term is used in N.J.S.A. 2C:49-6, includes a vacated sentence subject to an order of resentencing.
 
 
 39
 In the two opinions comprising the majority of this panel, this court has now held: 1) the district court judge did not err in determining that the term "discharged from the sentence" as it appears in N.J.S.A. 2C:49-6(a) constituted an uncertain and unsettled issue of state law; and that 2) this state law issue, if resolved by the state courts, would obviate the need for adjudicating a federal constitutional claim. (See Opinion, Cowen J., page 782: "We agree with the district court that the defendants have established the first two of the three 'special circumstances' necessary to bring a case within the ambit of Pullman abstention.") However, Judge Cowen then goes on to hold that the district court erred in deciding that an incorrect decision of state law made by it would disrupt important state policies.[1] Id. It is here that I part company with my two colleagues.
 
 I.
 
 40
 I agree that the issue giving rise to this appeal satisfies the first two criteria for Pullman[2] abstention; that is: (1) it presents an unsettled question of state law which the state courts have yet to address, and (2) an interpretation by the state courts would obviate the need to adjudicate Biegenwald's claims.
 
 A.
 
 41
 Biegenwald maintains that "discharged" should be interpreted to include all prisoners who, like Biegenwald, have had sentences vacated and who are awaiting resentencing. The State, on the other hand, contends that "discharged" has a different and much more narrow meaning. The State claims that the existence of an interim period between sentencings does not mandate the transfer of first degree murder inmates into the general population of the prison. According to the State, the term "discharged" implies a final and irreversible act and, because the vacation of a sentence subject to resentencing is not a final disposition and still leaves open the possibility of the reimposition of the death sentence, the State claims that Biegenwald has not had his sentence discharged. These two opposing views make it clear, as the majority of the court and I agree, that an unsettled issue of state law underlies Biegenwald's claim.
 
 B.
 
 42
 The second prong of the Pullman criteria requires that resolution of the "unsettled issue of state law" by state courts eliminate or narrow the constitutional claim before the federal court. Once again, the majority and I are in agreement because we are in accord that abstention is clearly appropriate where, as here, the resolution of the unsettled issue of state law by a state court, i.e. what is meant by a "discharged sentence", would allow the federal court to avoid an unnecessary constitutional adjudication. So far, the majority and I see eye to eye.
 
 C.
 
 43
 Where we disagree, however, is with respect to the third Pullman prong. This criterion requires a determination that an erroneous decision of state law by the federal court would be disruptive of important state policies. See D'Iorio v. County of Delaware, 592 F.2d 681 (3d Cir.1978). Judge Thompson held that if she were to make an incorrect decision in interpreting N.J.S.A. 2C:49-6 it would disrupt important state interests in the safe operation of the prison.[3]
 
 
 44
 Judge Thompson obviously based that determination on the State's position that:
 
 
 45
 There can be no question that the State acting through its police power is legitimately and vitally concerned with protecting the security, safety and well being of its prisons, the prisoners and the prison employees therein. Segregating death row prisoners is done to increase security to prevent escapes of the most dangerous prisoners, and to reduce friction among inmates. Since the State has the strong interest in safeguarding its prison population, such interest being grounded in the inherent police power of the State, appellees submit that the impact of an erroneous federal interpretation of a state statute could be detrimental and disruptive to the State Corrections process. (State's Brief, p. 12)
 
 
 46
 Significantly, neither Judge Cowen nor Judge Seitz discuss New Jersey's vital interest in the maintenance, conduct and administration of its prison system. I have previously referred to a state's core interest in its penal system in my dissenting opinion in Harris v. Pernsley, 755 F.2d 338, 349 (3d Cir.1985). I said there, what I believe to be equally relevant here: "I can think of no more weighty, vital or intimate state interests than the administration of a state's penological system. Indeed, the Supreme Court has given the federal courts unambiguous instructions to pay great deference to the States' weighty interest in administering their own prison systems." See generally Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).
 
 The Supreme Court has also stated:
 
 47
 Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the Legislative and Executive Branches of Government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in Martinez, additional reason to accord deference to the appropriate prison authorities. See id., at 405, 94 S.Ct., at 1807. (Emphasis added)
 
 
 48
 See Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987).
 
 
 49
 In Procunier v. Martinez, 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224, the Supreme Court recognized the critical interest that a state has in its prison system, stating that "[T]he case at hand arises in the context of [California] prisons. One of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task."
 
 
 50
 Despite these teachings, neither Judge Cowen's opinion nor Judge Seitz' gives weight to New Jersey's interest in its own prison operation. I find this hard to understand because it seems obvious to me that an erroneous interpretation of a New Jersey statute by a federal court could well have a serious effect on the Department of Corrections' ability to maintain, monitor and safely house inmates who have been sentenced to death. Indeed, as the State claims, it might even result in escapes or attacks on other prison inmates by inmates who were released, perhaps temporarily, from death row pending their resentencing. Moreover, such prisoners may feel that they have less to lose than other prisoners if they engage in violent behavior or attempt escape while in the general population.
 
 
 51
 Thus, it appears to me, even though my colleagues do not agree, that the third prong of Pullman has been more than satisfied. There can be little question that the state has a vital interest in its penal policies, and that an erroneous interpretation by a federal court of a penal statute would disrupt the state's administration of its prisons. "No matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination." Pullman, 312 U.S. at 499, 61 S.Ct. at 644. It was in such a context that the Supreme Court cautioned that a federal court ought not to intrude on the final authority of a state court to interpret doubtful regulatory law of the state. Id. at 500, 61 S.Ct. at 645. Thus, I submit that this case is a classic instance of a case meeting all three of the "special circumstances" required for the application of Pullman abstention.
 
 II.
 A.
 
 52
 Judge Cowen, however, argues that New Jersey state prison policies would not be disrupted even by an incorrect federal construction of N.J.S.A. 2C:49-6 because, he points out, Biegenwald at one point had been transferred to the prison's general population during the time that he was still under a death sentence. (Opinion, Cowen, J., 752) I suggest that this single circumstance, which forms the predicate for this argument and the reversal of Judge Thompson's abstention ruling, cannot withstand scrutiny and cannot affect the abstention order of the district court. The fact that a prison administrator undertook to transfer Biegenwald from death row to the general prison population at a time before Biegenwald's death sentence had been vacated, can in no way diminish the force of the state's policies or interests, particularly in the absence of anything in the record to explain why this transfer was made. I point out that because the record is silent, we cannot know the reasons for Biegenwald's transfer at the time that it was made. Thus, we do not know the conditions that then existed in "death row" or in the prison generally at that time nor what prompted this particular event to occur. In the absence of a record explanation, I cannot accept Judge Cowen's contention that one unexplained prison event is sufficient to reverse Judge Thompson's order of abstention.
 
 B.
 
 53
 Judge Cowen, in holding that the district court abused its discretion, advances still another argument as to why an incorrect interpretation on Judge Thompson's part would not disrupt important state interests. In his view, there is no distinction between a prisoner whose death sentence has been vacated and who is awaiting resentencing, and a prisoner who has been convicted of a crime for which he may receive a sentence of death but who has not yet been sentenced. Id, 752. I suggest that it is not for us to decide whether there is a practical distinction between the sentencing status of such prisoners. Whatever differences in status may exist are for the state authorities to assess and weigh, and not for us. Similarly, those New Jersey statutes or regulations dealing with administrative segregation and protective custody to which Judge Cowen refers cannot be deemed to answer the question presented here as to whether an erroneous interpretation of New Jersey's penal code by a federal court would disrupt important state interests. A state may choose many means of administering, protecting, securing and maintaining its prisons, none of which are exclusive of the others. Thus, there is nothing unique or unusual for New Jersey to have segregated death row inhabitants in a Capital Sentence Unit and at the same time provide for other and additional security and protective measures. The mere presence of such statutes and regulations does not give us license to intrude on the state authorities or the state interests in managing the state's own prison affairs.
 
 III.
 
 54
 The other arguments mounted by Judges Cowen and Seitz in holding that abstention was inappropriate and that Judge Thompson abused her discretion in ordering abstention, are even less persuasive than the arguments to which I have referred above.
 
 A.
 
 55
 Judge Cowen makes two additional points which, in his view, weigh against invoking abstention. First, he calls attention to "the inevitable delay engendered by requiring Biegenwald to seek a state court decision." Opinion, Cowen, J., 753. He points out that Biegenwald may no longer be living by the time this dispute winds its way through the state court system. But in this respect, Biegenwald is no different than any other plaintiff in the federal court where the federal court abstains. None have a guaranty or assurance as to how long they will live. I note that Biegenwald has yet to attack his new death penalty in the New Jersey Supreme Court. Undoubtedly, if he fails there, Biegenwald will then resort to habeas proceedings through the federal courts up to and including the Supreme Court. While none of us can predict the length of time that such proceedings may take, it is more than reasonable to assume that any state court proceedings brought by Biegenwald would long since have been resolved before Biegenwald's death penalty fate was ultimately determined by the courts.
 
 
 56
 Judge Cowen does admit that the district court's abstention order was entered before Biegenwald was resentenced to death, but he dismisses that fact by claiming that "[w]e would be remiss were we to ignore the impact of this event [the new death sentence] on the issue before us. Id. at 753. It has always been my impression that we judge the proper exercise of discretion at the time that the discretion was exercised. When Judge Thompson entered her order, Biegenwald was still awaiting resentencing. I do not understand how we can charge her with abusing her discretion by not taking into account the fact that Biegenwald would once again receive a death sentence and would therefore not be alive to testify in any state court proceeding, a factor which in any event I find irrelevant in the Pullman calculus.
 
 B.
 
 57
 Judge Cowen's second argument weighing against abstention is his claim that New Jersey does not have a procedure whereby a federal court can certify a state law question to the state system. I agree. New Jersey does not have such a procedure. This does not mean, however, that Biegenwald could not commence either (1) a Sec. 1983 proceeding in state court similar to the one he has brought in federal court or (2) an action for declaratory relief in the New Jersey Superior Court under the Uniform Declaratory Judgment Law, N.J.S.A. 2A:16-50, et seq., particularly, N.J.S.A. 2A:16-53. Pursuant to this law, appellant may "obtain a declaration of rights, status or other legal relations" under N.J.S.A. 2C:49-6. See N.J.S.A. 2A:16-53. "[A]fter obtaining the authoritative state court construction for which the court abstained," appellant may then, as of right, return to the district court for a final determination of his Sec. 1983 claims. NAACP v. Button, 371 U.S. 415, 427, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963). Any such action would obviously result in a ruling on the proper construction of the words "discharged from the sentence" as they appear in N.J.S.A. 2C:49-6.
 
 C.
 
 58
 Judge Seitz, in his separate opinion, argues that he believes the district court abused her discretion in entering an abstention order because he has substantial doubt that Biegenwald could obtain a construction of the New Jersey statute in question in any appropriate state proceeding. In this connection, he refers to Biegenwald's failure to comply with the notice provisions of the New Jersey Tort Claims Act[4] and he calls attention to the fact that the statute of limitations may bar a claim by Biegenwald in New Jersey courts.
 
 
 59
 However, the New Jersey Supreme Court has held that the filing of a complaint in federal court tolls the two year statute of limitations for personal injury actions where the state court action would otherwise be barred. It so held in a case where the federal court lacked subject matter jurisdiction, a far more egregious circumstance than the situation presented here. Galligan v. Westfield Centre Service, Inc., 82 N.J. 188; 412 A.2d 122 (1980). Indeed, the Galligan holding was acknowledged in a case in this court where both Judges Cowen and Seitz were on the panel. In Young v. Clantech, Inc., 863 F.2d 300, 301 (3d Cir.1988), this court distinguished between a complaint filed in federal court which lacked personal jurisdiction and therefore would not be tolled by New Jersey's statute, from a Galligan complaint which lacked subject matter jurisdiction and was subject to tolling. This being so, I know of no reason why any action (such as a Sec. 1983 action or an action for declaratory relief as discussed above) could not be prosecuted in New Jersey's courts.
 
 D.
 
 60
 As to Judge Seitz' second argument against abstention where he contends that Biegenwald might be met with a qualified immunity defense that would result in not resolving the critical state law issue involved here, I can only surmise that such a defense would be equally available to the State if Biegenwald's suit were to proceed before Judge Thompson. Moreover, we have dealt with a problem similar to the problem posed by Judge Seitz in Davidson v. O'Lone, 752 F.2d 817 (3d Cir.1984) (in banc), aff'd sub nom., Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1985), where the possibility of the defendants' immunity did not prevent our in banc court from holding that mere negligence did not give rise to a Sec. 1983 claim brought in federal court, even though New Jersey law provides no remedy for the plaintiff.[5]
 
 
 61
 Moreover, even if we were to accept Judge Seitz' argument (and I do not) that we must look to the existence of a potential immunity defense in state law to determine federal jurisdiction, the logical extension of such an argument would require that a federal district court would be obliged to canvas every possible or potential defense that might be raised by a defendant in a state court action before it could issue an abstention order. I know of no case law which would place such an onerous burden on the district court or which would require anything approaching such an exercise. As I understand Judge Seitz' argument, it would not only require the identification of such a defense by the district court judge, but it would also require a prediction by the district court judge as to whether such a defense would succeed. If it would, federal jurisdiction must be entertained; if it would not, the district court could abstain.
 
 
 62
 In my view, once the three special circumstances of Pullman have been satisfied and the district court has properly exercised its discretion and has entered an appropriate abstention order, there are no other factors to be considered which should defeat that ruling. Abstention cannot depend on the existence of a particular state procedure or the availability of a state remedy. If it were otherwise, it would be the state which would be setting the standards for and determining the existence of federal jurisdiction. Of course, in this case, Biegenwald has available to him actions which he can prosecute in state court. It was his choice to file his action in federal court in the first instance, and having done so, he should not be heard to complain about the paucity of state court procedures and remedies.
 
 IV.
 
 63
 I am satisfied that the interests which Judge Thompson identified as important state interests which should not be disrupted by the possibility of an erroneous federal court interpretation, present a paradigmatic case for abstention. None of the reasons advanced by either Judge Seitz or Judge Cowen persuade me, nor I suggest should persuade others, that the district court abused its discretion.
 
 
 64
 Indeed, I am concerned that by giving credence to such arguments the law of abstention as it has evolved in this circuit may become so distorted as to encourage, rather than discourage, federal resolution of all cases where state law is uncertain and a determination by a state court would obviate the need for a constitutional adjudication. The prospect that we may now be in the process of glossing established abstention doctrine by adding to it consideration of additional factors, such as how long a plaintiff may live, and does the state provide effective remedies, is in my opinion a subversion of the principles announced in Pullman.
 
 
 65
 Because Judge Thompson properly considered and applied the criterion for abstention and did not, in my opinion, abuse her discretion in abstaining, I would affirm Judge Thompson's order administratively terminating Biegenwald's action pending the initiation and outcome of state court proceedings. Because the other two members of this panel have determined otherwise, I dissent.
 
 
 
 *
 Since the date of the submission of this case, Judge Seitz has taken senior status
 
 
 [1]
 Biegenwald does not contend in this lawsuit that his present confinement in the Capital Sentence Unit is unlawful
 
 
 [2]
 Biegenwald also argues that the administrative regulations adopted by New Jersey pursuant to this statutory provision support his interpretation. In relevant part, the regulations state:
 SUBCHAPTER 4. CAPITAL SENTENCE UNIT (C.S.U.)
 10A:5-4.1 ScopeH
 Persons sentenced to death pursuant to N.J.S.A. 2C:11-3 shall be assigned to the Capital Sentence Unit (C.S.U.) until such time that the execution is carried out or in the alternative, that the sentence is commuted or otherwise changed to a lesser penalty.
 10A:5-4.2 Establishment of the Capital Sentence Unit (C.S.U.)H
 (a) The Commissioner shall designate a specific housing unit at New Jersey State Prison to be utilized solely for inmates under court imposed death sentence. There shall be no commingling of inmates in the Capital Sentence Unit (C.S.U.) with those in general population at New Jersey State Prison.
 (b) Female inmates under death sentence shall be housed in a separate section of the C.S.U. designated by the Commissioner.
 (c) Access to inmates in the C.S.U. shall be only as set forth in this subchapter and the post orders promulgated in connection herewith.
 N.J. Admin. Code tit. 10A, Secs. 5-4.1 & 5-4.2 (Supp.1989) (emphasis added).
 We agree with Biegenwald that regulation 10A:5-4.2, which requires that the Capital Sentence Unit be used "solely for inmates under court imposed death sentence," does support his interpretation of N.J.Stat.Ann. 2C:49-6. Regulation 10A:5-4.1, however, which requires that inmates sentenced to death remain in the Capital Sentence Unit until "the sentence is commuted or otherwise changed to a lesser penalty," is more ambiguous. Given that "an administrative interpretation of a facially ambiguous state statute will not remove the ambiguity, for Pullman purposes," Muir, 792 F.2d at 362, we do not find these New Jersey administrative regulations to be of much assistance in our analysis of N.J.S.A. 2C:49-6.
 
 
 [3]
 Since the statute here is "obviously susceptible" to a construction which would obviate the need to decide the federal constitutional issue, we do not reach the issue of whether a lesser showing might be sufficient to invoke Pullman abstention. See 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4242, at 42-44 (1988) (noting that the Supreme Court has, at various times, applied "obviously susceptible," "fairly susceptible," and "bare possibility" standards when assessing how uncertain state law must be to invoke Pullman abstention)
 
 
 [4]
 This conclusion is even more compelling when we factor in the weakness of the defendants' assertion that an erroneous construction of the words "discharged from the sentence" would interfere with important state policies
 
 
 [1]
 Judge Seitz' opinion does not address the three-pronged criteria of Railroad Commission of Texas v. Pullman, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). However, by concurring with Judge Cowen's holding, I assume that he agrees with Judge Cowen's Pullman analysis
 
 
 [2]
 Railroad Commission of Texas v. Pullman, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)
 
 
 [3]
 District Court Opinion at 2
 
 
 [4]
 I suggest that, if for no other reason, Biegenwald's choice of a federal action and his failure to comply with New Jersey statutory mandates, cannot leave him in a better position in federal court than he would have found himself in had he maintained his action in state court
 
 
 [5]
 Judge Seitz dissented in Davidson. See Davidson v. O'Lone, 752 F.2d 817 at 833 (3d Cir.1984)